## EUEL LEE *v.* STATE OF MARYLAND.

[No. 64, April Term, 1932.]

*Decided July 5th, 1932.*

The cause was argued before BOND, C. J., URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Joseph R. Brodsky,* with whom were *Bernard Ades* and *David Levinson* on the brief, for the appellant.

*William L. Henderson, Assistant Attorney General* and *Godfrey Child, State's Attorney for Worcester County,* with

whom were *William Preston Lane, Jr., Attorney General, Willis R. Jones, Deputy Attorney General, James C. L. Anderson, State's Attorney for Baltimore County,* and *James A. McAllister, State's Attorney for Dorchester County,* on the brief, for the State.

BOND, C. J., delivered the opinion of the Court.

The appellant, convicted of murder in the first degree and sentenced to death, brings before this court for review rulings of the trial court on challenges on his behalf to the array of petit jurors. There is no question of any error, or any lack of fairness, in the proceedings in the trial by the jury ultimately sworn. Six of the members of that jury were selected from the panel regularly in attendance for the court term, and six from extra talesmen summoned from the courtroom. The questions submitted to this court are two: Whether a departure from the method specified by statute for placing names of taxpayers and voters before the court as a basis of selection of the panel of jurors for the term rendered the make-up of that panel illegal, and whether, in violation of the provisions of the Fourteenth Amendment of the Constitution of the United States, negroes were excluded from those summoned for the panel, and from those summoned from the courtroom. The appellant is a negro. See the previous appeal in the case, *Lee v. State,* 161 Md. 430, 157 A. 723.

The appeal has not been perfected in entire compliance with the rules governing appeals to this court, and there has been filed a motion to dismiss it because a form of bill of exceptions to present the rulings sought to be reviewed was not presented and signed, as required by the rule of the trial court, during the pending term of court. The term in this instance, the December term of the court, expired on March 7th, 1932, and the bill of exceptions was presented for signature on April 18th, 1932, six weeks after the close of the term. The attorneys for the State refused to approve the form, and the court declined to sign it as a bill of exceptions because of lack of power to do so then, but did certify

that the bill correctly reported the transactions which attended the selection of the jury.

A bill of exceptions seems not to be required, and therefore the failure to present the form prepared, within the time fixed for presenting bills of exceptions, does not afford ground for dismissing the appeal. As a bill of exceptions, the paper could not be considered because of the delay, but a bill of exceptions is not the only method of bringing before this court testimony and facts appearing in summary proceedings, as upon various motions. *Fick v. Towers,* 152 Md. 335, 338, 136 A. 648. Bills of exceptions were not permitted in criminal cases until recent years, in Maryland not until the Acts of 1872, ch. 316, yet challenges to arrays of jurors, for principal cause, as here, with the facts laid before trial courts, have long been considered on appeals at common law. It was always necessary that the challenges be in writing, and be answered in writing (*Chitty, Criminal Law,* 546), but they were made in several forms of written proceedings. Sometimes pleas in abatement were used to raise objections to arrays of grand jurors. *Avirett v. State,* 76 Md. 510, 537, 25 A. 676, 987; *Clare v. State,* 30 Md. 172. And there are many instances of the use of motions to quash indictments, and motions in arrest of judgment, to challenge arrays of both grand and petit jurors. *Burk v. State,* 2 H. & J. 426; *Horsey v. State,* 3 H. & J. 2; *Cooper v. State,* 64 Md. 44, 20 A. 986; *Hollars v. State,* 125 Md. 367, 368, 93 A. 970; *O'Connell's* case, 11 Cl. & F. 155, 221; *People v. Vermilyea,* 7 Cow. (N. Y.) 108; *People v. Mather,* 4 Wend. (N. Y.) 229; *King v. Edmonds,* 4 B. & A. 471, 474; *Chitty, Criminal Law,* 547. In the earlier of these cases, the facts were brought up by means of agreed statements, by written depositions, or by certificates of judges. And, on appeal, the review was not one of particular rulings, for reversal of the ultimate determination because of error in any one or more of them; it was a review of the decision, or, more accurately, a decision by the appellate court for itself, on the whole record, as on many motions in civil cases, proceedings upon a petition for mandamus tried before

the court, or motions to quash indictments on other grounds. *Baldwin v. Wright,* 3 Gill, 241; *Moreland v. Bowling,* 3 Gill, 500; *Howard v. Oppenheimer,* 25 Md. 350; *Palmer v. Hughes,* 84 Md. 652, 36 A. 431; *Hollowell v. Miller,* 17 Md. 305; *Bragunier v. Penn,* 79 Md. 244, 246, 29 A. 12; *Pope v. Whitridge,* 110 Md. 468, 474, 73 A. 281; *Darrin v. Hoff,* 99 Md. 491, 493, 58 A. 196; *Manger v. Board of State Medical Examiners,* 90 Md. 659, 673, 45 A. 891; *Deibert v. State,* 150 Md. 687, 695, 133 A. 847. The Acts of 1872, ch. 316, now section 86 of article 5 of the Code, in permitting the use of bills of exceptions in criminal cases, gave no indication of an intention to make that the exclusive method of bringing up the facts, and we do not construe it to prohibit the continued use of the methods previously worked out. Moreover, the present case is peculiar, in that the facts brought up were not facts presented to the trial court for its consideration and decision; the court had the facts, and announced them to the parties. A practice of the court was in question, and the certification by the court of the facts of that practice seems closely analogous to certification of a rule of court. There is no departure from settled practice in it, and the time limit for bill of exceptions does not apply. The limit upon bringing up the facts in this manner is to be found only in that fixed for bringing the record to the court.

Reference was made in the oral argument to the requirement of Rule 25 of this court that on appeals in criminal cases the records shall be transmitted forthwith after the appeals are taken; but the decisions in the cases of *Luray v. State,* 157 Md. 635, 640, 147 A. 599, and *Brill v. State,* 144 Md. 68, 124 A. 414, applying to appeals in criminal cases a clause of the statute, Code, art. 5, sec. 6, which allows three months for transmission of records on appeals from courts of law, prevent dismissal of the present appeal because of delay in transmitting the record. The court must entertain the appeal, and review the rulings objected to.

When the case was called for trial, and on the day of the trial, the challenge to the array of the petit jurors on the

panel in attendance was filed, in writing, on the defendant's behalf, and answered in writing on behalf of the State. First, it was objected that, whereas the provisions of the local law governing the make-up of a petit jury panel required that the names should be selected from a special list of taxable inhabitants furnished by the clerk of the county commissioners and a special poll list prepared by the clerk of the supervisors of elections, there had been, in fact, no such lists prepared, and the names had been, according to custom in that jurisdiction, first selected by one of the judges from his contacts and information, as those of desirable residents of the county, and then compared with both the general tax books and the poll list of the supervisors. The law required that men should be selected with reference to their intelligence, sobriety, and integrity, and therefore choice of men from contacts or reliable information was necessary at one stage in the process. Acts of 1929, ch. 339, amended by Acts of 1931, ch. 25. The objection seems to be, then, in part to the lack of lists specially prepared for the use of the judges, and in part to a reversal of the order outlined in the statute by selection of eligible men before the scanning of the poll list and the tax books, instead of scanning the lists first, and then making the choice from among the names on them. It seems to the court that the difference is not a material one, so far as compliance with the state law is concerned, and involves no substantial likelihood of unfairness, and should not be held to vitiate the trial in this instance, unless the statutes command it. And it was decided in the earlier case of *Hollars v. State*, 125 Md. 367, 93 A. 970, that the method followed in this case was sufficient. The statutory provisions in force at the time of that decision required the same use of the lists as is now required.

The objection to the selection of talesmen from the court-room, on the ground of discrimination against negroes, is not supported sufficiently by the evidence, and requires little comment. In securing talesmen under the direction of the court, in pursuance of section 15 of article 51 of the Code, the sheriff selected only white men, although it appears that

there were a few colored men in the room. The court, in ordering one of the earlier additions of talesmen from the room, instructed the sheriff neither to summon, nor to refrain from summoning, any citizen or person eligible, because of his color; and the sheriff, sworn as a witness, testified that he did not refrain from summoning any such person. We could not find from the proceedings as reported that he did. Therefore, if there was any improper exclusion of negroes, it could have been only in the selection of the persons called for the regular panel for the term, from which six of the petit jury were secured. That was done according to long-established custom in Baltimore County. At the request of counsel for the prisoner, Judge Duncan, from the bench, explained the method.

Judge Duncan had done the work of drawing juries for the court throughout the preceding twenty-six years. He had the poll list and the tax books of the county in each instance, but he first procured the names of good men from suggestions from his outside contacts. "A witness," he said "may impress me on the stand favorably; I may meet some one at some social gathering or some church gathering; I make a memorandum of him. I go to the tax books and the registered voters list to see if he is there, and the next step is to inquire, from people in the community in which he lives, whether he is a good man, whether he pays his debts, is honest, sober, and if he is thought well of in his community. These are the only qualifications I am looking for, and that is the way the jury is selected." The poll list would show whether a given name is that of a white man or a negro. In all the years in which these selections had been made the judge had never selected a negro for jury service, and, asked whether he had excluded negroes from consideration, said he did not consider them at all, that he did not exclude them from consideration, but did not consider them at all. He thinks it quite likely that he has made selections of thousands of men. In explanation of his statement that he had not considered negroes at all for jury service, Judge Duncan added that he meant that he did not consider negroes any

more than he considered any other race or sect; he selected the men who were good men in his judgment and who were all vouched for. And further he explained that in the selection of a juror, or a jury, he proceeded about on the same line as the President of the United States proceeds on when he selects a cabinet. The President wants to get men in the cabinet who are competent for the purpose for which they are selected, and then he wants a harmonious body, and that is what Judge Duncan does in the selection of jurors. And asked specifically whether he discriminated against negroes as such, or in favor of other races as such, Judge Duncan answered, "Absolutely not." That there are respectable, law-abiding, property owning, negroes whose names appear either on the taxable list or the poll books of the county is undisputed. And to a question how it happened that negroes otherwise respectable and possessing qualifications for jury service and selection for jury service had never in all the years that he had made selections for juries been chosen by him for jury service, Judge Duncan answered: "Probably the best answer I can give you is that there is nothing in the Constitution or the law of this State that says that I must select negroes or that I must select Chinamen or any other race or nationality. I think I have been given discretion in the selection of jurors and I am working solely for the administration of justice in an orderly manner and I select a jury conscientiously to that end."

It was stated in argument, and apparently agreed, that the negro population of Baltimore County numbers 11,764 out of a total population of 124,565, or a little less than one in ten. But it should be remembered that these numbers do not present an accurate statement of the proportion of eligible negroes, because of differences in the economic and other conditions of the two races. There is a much larger proportion of the negroes than of the whites in the class of workers who could serve on juries only at the cost of a prohibitive sacrifice of earnings and employment.

In this, as in most of the other recent cases which have had to deal with this question, there is no ground for objec-

tion to the laws governing the selection of jurors in Baltimore County. They do not authorize any discrimination merely on account of race or color. Discrimination is charged only in the practice, as explained by Judge Duncan, in pursuance of which half of the petit jurors sworn in the case were selected. The principles which control are derived from the decisions of the Supreme Court of the United States, and are thus summed up in the case of *Carter v. Texas,* 177 U. S. 442, 447, 20 S. Ct. 687, 689, 44 L. Ed. 839 : "Whenever by any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States." The objection in that case was one to exclusion from a grand jury, but the principle is applied 'alike upon challenges to panels of grand and petit jurors. *Strauder v. West Virginia,* 100 U. S. 303, 25 L. Ed. 664; *Virginia v. Rives,* 100 U. S. 313, 25 L. Ed. 667; *Ex parte Virginia,* 100 U. S. 339, 25 L. Ed. 676; *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567; *Bush v. Kentucky,* 107 U. S. 110, 1 S. Ct. 625, 631, 27 L. Ed. 354; *Gibson v. Mississippi,* 162 U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075; *Rogers v. Alabama,* 192 U. S. 226, 24 S. Ct. 257, 48 L. Ed. 417; *Thomas v. Texas,* 212 U. S. 278, 29 S. Ct. 393, 53 L. Ed. 512; *Franklin v. South Carolina,* 218 U. S. 161, 30 S. Ct. 640, 54 L. Ed. 980. The Supreme Court finds no requirement that negroes be represented on the panel in any one case or term of court; there may be a lack of such representation with complete consistency with inclusion of negroes in the field of choice. "There was no legal right in the accused to a jury composed in part of his own race. All that he could rightfully demand was a jury from which his race was not excluded." *Bush v. Kentucky,* and *Franklin v. South Carolina, supra. Bullock v. State,* 65 N. J. Law, 557, 47 A. 62, 86 Am. St. Rep. 668. "While a state, con-

sistently with the purposes for which the amendment was adopted, may confine the selection of jurors to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications, and while a mixed jury in a particular case is not, within the meaning of the constitution, always or absolutely necessary to the enjoyment of the equal protection of the laws, and therefore the accused, being of the colored race, cannot claim, as matter of right, that his race shall be represented on the jury, yet a denial to citizens of the African race, because of their color, of the right or privilege accorded to white citizens of participating as jurors in the administration of justice would be a discrimination against the former inconsistent with the amendment and within the power of congress, by appropriate legislation, to prevent; that, to compel a colored man to submit to a trial before a jury drawn from a panel from which were excluded, because of their color, men of his race, however well qualified  by education and character to discharge the functions of jurors, was a denial of the equal protection of the laws; and that such exclusion of the black race from juries because of their color was not less forbidden by law than would be the exclusion from juries, in states where the blacks have the majority, of the white race because of their color." *Gibson v. Mississippi,* 162 U. S. 565, 580, 16 S. Ct. 904, 906, 40 L. Ed. 1075.  But no positive action at all is required as a performance of the duty imposed by the Constitution; it requires purely a negative, the abstaining from exclusion of negroes from the competition of qualifications for selection of jurors, and the chance of gaining places on panels.  Indeed, any selection of a negro because he is a negro, or any special consideration given to his race, would be a violation of the law for selecting jurors.  As Judge Ritchie said for this court in *Cooper v. State,* 64 Md. 40, 47, 20 A. 986, 988, "To place colored persons on a jury simply because they are colored men would be a violation of the law as well as to exclude them for that reason."

Whether there has been exclusion in a drawing is a ques-

tion of fact, the challenger bearing the burden of establishing the fact. *Martin v. Texas,* 200 U. S. 316, 26 S. Ct. 338, 50 L. Ed. 497; *Virginia v. Rives,* 100 U. S. 313, 25 L. Ed. 667. And as no specific outward act, either in selection of negroes at particular times, or in any special treatment of their race, is required to manifest compliance with the constitutional provision, it would seem that the fact would seldom be provable. Looking at it from another point of view, it would seem difficult for a trial judge to register or show compliance with the requirement. If the judge or other officer drawing jurors should state that he excluded negroes, then, of course, no further proof would be needed. Such were the cases presented in *Farrow v. State,* 91 Miss. 509, 45 So. 619, and *Whitney v. State,* 42 Tex. Cr. R. 283, 59 S. W. 895. In Baltimore County, as it appears from Judge Duncan's explanation, the judge has merely sought about him for good men to aid, as jurors, in the proper administration of justice, without letting racial considerations enter into his choice. His action, he says, has been merely that of selection, in the exercise of the discretion intrusted to him. But it has been strongly urged upon this court that the course of procedure followed, and the actual selections made by it throughout all the jury terms of the last twenty-six years, show an established practice or system in which no opening is left for members of the negro race to obtain places on juries, and that this amounts to exclusion in the constitutional sense. And there is no gainsaying that, in pursuing the method of noting down names of good men suggested to him in his daily routine, the judge has not taken down any but those of white men. His system of drawing jurors begins with a collection of names of white eligibles, and hence is confined from the beginning to the selection of white men. Only the white men appear to have been looked to for jurors. The evidence, with the long, unbroken absence of negroes from the juries selected, seems to show an established practice, confining selections to white men as effectually as if such a restriction were prescribed by statute. And the court has concluded that this,

under the authorities, amounts to unconstitutional exclusion of negroes.

The Supreme Court, in *Neal v. Delaware,* 103 U. S. 370, 397, 26 L. Ed. 567, a case on a somewhat similar objection, has said: "The showing thus made, including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned as a juror in the courts of the State,—although its colored population exceeded twenty thousand in 1870, and in 1880 exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand,—presented a *prima facie* case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States." And a like inference from a long succession of juries of white men entirely was drawn with more emphasis in a case in Florida. "It would be beyond the ken of the judicial or any other mind to appreciate how a deputy sheriff in a county containing more negroes than whites could through a series of eight years in selecting jurors for all the courts of the county, abstain from selecting a single negro for jury service during all of those years," without unconstitutional discrimination against the members of the race. *Bonaparte v. State,* 65 Fla. 287, 61 So. 633. There has never been any modification by the Supreme Court of its statement as to the inference to be drawn from a long succession of entirely white juries, and it seems not likely that there will soon be one, especially in a case in which the evidence shows a system which begins with the collecting of names of white men only.

The overruling of the challenge must be held erroneous, and the judgment must, for the error, be reversed, and a new trial ordered.

*Judgment reversed, and a new trial awarded.*