UNITED STATES ex rel. JACKSON et al.
v. BRADY, Warden of Maryland
Penitentiary.

No. 1758.

District Court, D. Maryland.

Oct. 17, 1942.

William Curran, E. Paul Mason, Morton P. Fisher; and C. Arthur Eby, all of Baltimore, Md., for petitioners.

Douglas N. Sharretts and Joseph G. Finnerty, Asst. State's Attys., both of Baltimore, Md., and D. Heyward Hamilton, Jr., Asst. Atty. Gen. of Maryland, for respondent.

CHESNUT, District Judge.

In this habeas corpus case the three petitioners are Negroes who were indicted, tried, convicted and sentenced to be executed for first degree murder by the Criminal Court of Baltimore. Their appeal to this court to be released from their imprisonment is based on the alleged constitutional ground that in the selection of the Grand Jury which indicted them, and the Petit Jury which tried them there was racial discrimination against Negroes contrary to the provisions of the 14th Amendment of the Constitution of the United States.

The writ was issued on October 1, 1942, and made returnable on October 6th last. The respondent filed a formal answer denying that there had been any unlawful discrimination in the selection of the juries, and asserting that the petitioners had been accorded a fair trial with all constitutional rights. No formal traverse by pleading was filed to the answer. At the hearing here testimony was taken on two days, the petitioners being represented by four experienced counsel, and the respondent by two Assistant State's Attorneys of Baltimore City and one Assistant Attorney General of Maryland. After full consideration of the testimony and oral arguments and briefs of counsel, I have reached the conclusion that the writ must be dismissed on procedural grounds and also because the petitioners have not shown the existence of unconstitutional racial discrimination against Negroes in the selection of the juries. In accordance with the applicable Federal Rule Of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c, I make the following *Findings of Fact:*

1. The indictment was filed September 24, 1941; on September 26 the defendants were arraigned and each pleaded not guilty; the trial judge, Samuel K. Dennis (Chief Judge of the Supreme Bench of Baltimore City) appointed three able and experienced lawyers to defend the defendants at public expense; on October 23, 1941 the trial began and on October 29, 1941 the jury rendered a verdict of guilty of murder in the first degree as to each of the defendants; motion for a new trial was made and on December 16, 1941 overruled by the Supreme Bench of Baltimore City, which, under the Maryland Constitution, Art. 4, § 33, has jurisdiction to hear such motions in criminal cases; on December 18, 1941 notice was given of appeal to the Court of Appeals of Maryland where, on June 17, 1942, the judgments were affirmed (Jackson v. State, 26 A.2d 815); and later the Governor of the State of Maryland fixed October 2, 1942 as the date of execution.

2. On October 1, 1942 counsel for the petitioners submitted to the court a petition for habeas corpus which, on examination, was found to be insufficient in form as required by the applicable federal statute (28 U.S.C.A. § 454) and it was suggested to counsel that preferably the application for habeas corpus should be submitted to a Maryland State Judge. Later the petition, revised as to form and made more specific as to substantial averments, was re-submitted and the writ issued, after application to a State Judge had been refused by him, and the Governor of the State had granted a reprieve to one of the petitioners on account of his bad physical condition due to self-inflicted injuries.

3. The petition alleges racial discrimination against Negroes contrary to the 14th Amendment "in the respect that out of a colored population of approximately 20% of the total population of Baltimore City, only two jurors of the colored race were included in the array of more than 52 jurors submitted for the trial of the defendants' case; and that in the selection of the jurors for the general panels of juries for the trial of cases in Baltimore City the number of members of the colored race included thereon was so much less than the proportionate percentage of the colored population of Baltimore City as to amount to a discrimination and to be a denial of due process of law and equal protection of the laws to the petitioners." Counsel for the petitioners do not contend that the alleged discrimination exists in the written Constitution and laws of the State, but that it does exist in the practice now and long heretofore prevailing in the actual selection of juries by the Supreme Bench of Baltimore City.

4. The Maryland Declaration of Rights, Art. 5, provides "that the inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that law, * * *." The applicable statutory law with respect to the selection of juries in Baltimore City is contained in Article 51 of the Annotated Code of Maryland of 1939 (general statutes of the State) and in the local laws for Baltimore City (Baltimore City Char-

ter, 1938, §§ 687–709), and in rule 6 of the Supreme Bench of Baltimore City. By the local statutes and rules the method and procedure for the selection of juries is meticulously prescribed, but by section 709 the requirements "shall be construed as directory merely, and no indictment or presentment for any felony or misdemeanor shall be quashed, nor shall any judgment upon any indictment or presentment, whether after verdict, by confession or otherwise, be stayed or reversed, nor shall any challenge to the array of jurors be allowed because of any failure by the Judges or the Clerks, or the Sheriff, to comply with the provisions of law relating to the drawing of jurors in the City of Baltimore;". In brief, the statutory scheme is that the Judges of the Supreme Bench (eleven in number), or a majority of them, shall at a certain designated time "select fairly and impartially, and by the exercise of their best judgment, the names of 750 persons, or thereabout, qualified under the laws of this State to be Grand and Petit Jurors in the City of Baltimore." To assist them, section 688 provides that the City Collector shall furnish "a certified list of so many of the taxable male inhabitants, resident in the said City, as he may have been directed to furnish by the order of said Judges". From the list of 750 so selected the Grand Jury of 23 members is selected by the Supreme Bench for each term of court; and thereafter the names of jurors for the several jury courts in Baltimore City are drawn by lot. There are usually 7 jury courts sitting concurrently and a panel of 25 jurors is provided for each court, with provision for supplementing deficiencies in any court by unoccupied jurors assigned to other courts. Drawings by lot for each of the trial courts is commonly made every three weeks.

5. It will be noted that the list of taxable male inhabitants furnished to the Supreme Bench of Baltimore is merely to *assist* in the selection of 750 names and the Bench is not limited thereto in the selection. And by Art. 51, § 4, of the Maryland Code "no property qualifications shall be required in any juror."

Some years ago it was found by practical experience that the list furnished by the City Collector was unsatisfactory for use because not sufficiently specific with respect to the addresses and without sufficient information to enable the Bench to determine even the probable qualifications of the jurors under the requirements of Art. 51, which makes persons under 25 years of age ineligible, and grants exemptions to those over 70 years of age and to various other persons including schoolmasters, physicians, pharmacists and (by Art. 32, § 18) practicing dentists. To meet the difficulty the Supreme Bench adopted in practice a different method of selecting the 750 names, briefly as follows. A Jury Judge is appointed to ascertain preliminarily the qualifications of prospective jurors, and a jury clerk is appointed to obtain and furnish the names of persons to be examined as to their qualifications by the Jury Judge. From time to time the jury clerk selects names from the City Directory, the telephone directory and other sources considered reliable, and a summons is issued to the persons named to appear before the Jury Judge at a stated time to be examined touching his qualifications as a juror. Upon appearance the persons summoned are given a written questionnaire to answer. The inquiries so made are with respect to name, residence, age, citizenship, occupation, ability to read and write English, former jury service, former criminal convictions, if any, belief in the existence of a God, whether on relief or not, and what months of the year are most convenient for service; and what, if any, exemptions from petit jury service are claimed. When the questionnaire has been answered in writing the prospective juror then presents himself in person before the Jury Judge and may be further questioned or examined, after which the Jury Judge marks the name on the questionnaire as either accepted or rejected for prospective jury service. In this way the jury clerk acquires a so-called "service file" or reservoir of properly qualified jurors from which he submits for the approval of the Bench from time to time as needed, the list of 750 names, and the names of petit jurors to the number of 400 or 500 as may be needed from time to time are drawn by lot therefrom.

6. The contention that there is racial discrimination in the selection of the juries is based solely on the inference sought to be drawn from what is said to be a too small percentage of Negroes drawn for jury service in proportion to the number of white jurors. In support of this contention certain statistics have been submitted with respect to the number of the white and colored population of Baltimore City, and the number of white and colored

jurors actually drawn for service in Baltimore courts over a period of 8 years, and other supposedly relevant statistical data. The more important statistics so submitted are these. The colored population of Baltimore City by the census of 1940 was 19.3% of the whole population. The percentage number of colored jurors over a period of years has varied from 1 or 2 to 3 to 4% of the whole number of jurors. At the time of the trial of the particular case in the Criminal Court of Baltimore the number of colored jurors on the 7 panels of 25 each of the trial courts for that period of three weeks was 8 Negroes out of 175. In 1933 the number of colored jurors who served was 18; while the number of white jurors was 1957; for 1938 the number of colored jurors was 40 and the number of white jurors 1,710; in 1941 the total number of white petit jurors was 1,543 and the number of colored jurors was 32. From 1933 to date the sheriff has summoned 16,-695 white and 280 Negro jurors. Of the persons in Baltimore City 25 years of age who have completed 7 or 8 years of grade school, the proportion of male whites was about 60% and the male Negroes about 20%. Of those who completed high school or one to three years thereof, the proportion of whites was about 22% and the Negroes about 8% of the total population.

The "service file" of prospective jurors above mentioned kept by the jury clerk at the present time contains the names of 18,901 white persons and 653 Negroes, qualified to be jurors, and these numbers were substantially the same for the year 1941. The names are kept in a card file and classified as to separate months for most convenient service by the jurors. Different colored cards are kept for different classifications of the whole number, white cards for white jurors, and brown for colored, pink for military service and blue for physical disability or nonresidence. The clerk testified that the different colored cards were only for identification when cards had to be removed from the file for any reason, as for instance completed service as juror (not to be called again for two or three years) or notice of decease. Cards of all the different colors are kept in the same file without discrimination until removed for such causes. Of the 750 names on the list from time to time submitted by the jury clerk to the Supreme Bench for its approval there have always in recent years been the names of about 25 colored prospective jurors. The Grand Jury of 23 members for many years past has always contained in practice one colored juror.

7. It is not contended, nor even suggested, that the Supreme Bench of Baltimore City collectively or any individual member thereof, has been or is actuated by any conscious personal bias or prejudice against Negroes as a class in selecting juries. The method in practice of the actual selection of juries has been fully explained in this case by the uncontradicted testimony of Judge Dennis, who has been Chief Judge of the Supreme Bench of Baltimore since 1928, and of Judge J. Craig McLanahan, who has been a member of the Bench since 1938 and was the Jury Judge during 1941; and of Mr. Folger who has been the jury clerk since 1925. Their testimony also explains the comparatively small percentage of Negroes actually serving in past years. It is apparent from their testimony that there has been no systematic or arbitrary exclusion of Negroes because of their race or color; and on the contrary there has been a positive effort, especially by the Jury Judge, to obtain the services of qualified Negro jurors. That the number actually serving has been comparatively small is explained by a number of reasons. The examination of prospective jurors by the Jury Judge results in the elimination of many jurors both white and colored for different reasons. The questionnaire and the personal observation of the prospective jurors by the Jury Judge is obviously for the primary purpose of securing reasonably educated, intelligent, fair-minded and otherwise qualified jurors who are not exempt under the statutes and who can fairly be expected to serve without undue personal hardship.

The evidence shows that while the proportion of the colored population to the white is about 20 per cent, the percentage of Negroes qualified, able and willing to serve as jurors is probably much less in proportion to the whole number of white persons qualified and available as possible jurors. Many Negroes (probably the older ones) do not have sufficient educational qualifications; until recently a very large proportion in comparison to the white population has been on relief; the percentage of conviction of crime of Negroes is unfortunately higher than that of the whites; and many otherwise qualified Ne-

groes are exempt or excused from service on account of their occupation, either professional or industrial.

8. At the trial in the Criminal Court of Baltimore counsel for the defendants made no objection in any form, either by motion to quash the indictment or otherwise, to the constitution of the Grand Jury; and with respect to the Petit Jury the only objection made was an oral challenge to the array after 52 jurors had been examined on their voir dire, on the ground that only two of the number were Negroes, and therefore counsel made an objection to the whole panel in that it was not a jury selected in accordance with the Constitution of the United States and the Constitution and law of Maryland. No other evidence to support the challenge to the array was offered or submitted. The trial judge overruled the objection and an exception was noted. He referred to the Euel Lee Case, Lee v. State, 164 Md. 550, 165 A. 614, as controlling. The record on appeal merely reflected the objection so made and the exception taken. The point was overruled by the Court of Appeals of Maryland in the absence of evidence to support it.

9. As an ultimate fact, I find from the evidence that there has been no intentional and systematic exclusion of Negroes from juries in Baltimore City; and no discrimination against them in practice, on account of race and color in the selection of juries by the Supreme Bench of Baltimore City.

The *Conclusions of Law* are: (1) the writ of habeas corpus must be dismissed on the procedural ground that the petitioners, represented by competent counsel in the trial of their case in the State court, did not interpose any objection to the constitution of the Grand Jury; and did not submit any evidence in support of their charge of racial discrimination against Negroes in the composition of the Petit Jury panel, and therefore must be held to have waived that objection; and (2) on the substantial ground that the petitioners have not here shown any intentional, arbitrary or systematic exclusion of Negroes from the jury panels.

### Opinion

Counsel for the respondent contends that the writ must be dismissed on both procedural and substantial grounds. The procedural point is that the alleged constitutional right of the petitioners cannot properly be adjudicated by this court in this collateral proceeding by habeas corpus because (1) the petitioners did not exhaust their possible remedies by application to the Supreme Court for certiorari in the direct State prosecution against them, and (2) waived the constitutional right by not adequately presenting the point in the trial of the case in the State court.

The first of these reasons is not sustainable because it appears that the petitioners did exhaust their remedies in the State courts, by appeal to the Court of Appeals of Maryland, and later by an unsuccessful application to a State judge for release on habeas corpus, from whose decision there was no allowable appeal to any higher State court. Betts v. Brady, Warden, June 1, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. This question was considered in this court in the somewhat similar case of Gall v. Brady, Warden, D.C., 39 F.Supp. 504, in which on affirmance by the Circuit Court of Appeals (4 Cir., 125 F.2d 253, 254) that Court said:

"We agree with the judge below that, in view of the contention of petitioners that they had been denied due process and had exhausted their remedies in the courts of the State of Maryland, it was proper for him to issue the writ of habeas corpus for the purpose of inquiring into the legality of their imprisonment. Frank v. Mangum, 237 U.S. 309, 327, 35 S.Ct. 582, 59 L.Ed. 969; Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406."

No doubt it is desirable for many reasons that application for certiorari to the Supreme Court of the United States should be made from a final adverse decision by the highest court of the State in criminal cases where federal constitutional rights have been asserted and denied, and where errors in denial of such rights can be corrected while the direct proceeding is still open, rather than by resort to the federal district court in the collateral proceeding of habeas corpus. One reason is that, until recently at least, there has been some uncertainty whether a state prisoner released on habeas corpus by a federal court in a collateral proceeding, for error on federal constitutional grounds in his trial, could be re-tried in the State court against his possible plea of former jeopardy. Where, in the direct proceeding by appeal to the Supreme Court the

conviction is reversed, there would obviously be no legal obstacle to a re-trial of the case. Hill v. State of Texas, June 1, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L. Ed. 1559; Bryant v. United States, 8 Cir., 214 F. 51. But this doubt, as to the effect of release of a State prisoner in a collateral habeas corpus proceeding, has just now been resolved by the Court of Appeals of this Circuit in the case of Mitchell v. Youell, Supt. Virginia State Penitentiary, 130 F.2d 880, in which case the court ordered the release of a State prisoner in a habeas corpus proceeding. Speaking for the Court, Judge Parker said:

"This does not mean, however, that petitioner may escape further punishment under the bill of indictment returned against him. While the conviction and sentence under the bill must be held to be void and the prisoner released from further service of the sentence, he will be subject to arrest and trial under the indictment. The defense of prior jeopardy will not protect him, for in holding that the trial was a nullity, we hold that he has not been in jeopardy under the charge. * * * In directing the release of the petitioner from the penitentiary, therefore, the Court should direct that he be delivered to the officers of the State of Virginia to answer the charge contained in the indictment."

■ The second reason advanced in support of the procedural point is more serious. The constitutional point now relied on is alleged racial discrimination in the selection of both the Grand and Petit Juries dealing with the petitioners' case. As to the Grand Jury, no objection thereto was raised at the trial in any form, either by motion to quash the indictment or otherwise. And with respect to the constitution of the petit jury the only objection made at the trial was in the course of the examination of petit jurors on their voir dire, when counsel for the petitioners made an oral challenge to the array on the ground that of 52 jurors previously examined, there were only two Negroes, and counsel said:

"We wish to challenge the array on the ground that it is not a jury selected in accordance with the Constitution of the United States and the Constitution and law of Maryland."

Apparently without further argument or offer by counsel to submit testimony in support of the challenge to the array, the court overruled the objection and an exception was noted. In this form only was the point made and preserved for consideration by the Court of Appeals where the exception was held not sustainable, in the absence of any supporting proof in the record. It appears that in the preparation of the case on appeal counsel for the appellants endeavored to supplement the record by some statistical data which, however, was successfully opposed by counsel for the State, because it had not been offered or introduced at the trial. It is the contention of counsel for the respondent here that where in a State criminal trial the defendant is represented by competent and experienced counsel, even constitutional rights known or presumed to be known to counsel to exist must be held to have been waived if not made at all or are inadequately presented. After examination of the applicable judicial decisions, I have concluded that this contention is sound.

■ The federal courts have habitually interfered only reluctantly with State court criminal procedure, especially where the attack is made in a collateral and not in a direct proceeding. With respect to the present objection to the constitution of the Grand Jury, no objection at all was made in the State court. And in all the Supreme Court cases which I have noted in which it has been held that a State Grand Jury was invalidly constituted by reason of racial discrimination against Negroes, the objection thereto has been properly made by motion to quash the indictment or otherwise, in accordance with applicable State procedure. For illustration, see Hill v. Texas, supra; Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84. And as to the Petit Jury the only objection was the oral statement of counsel of the fact that of 52 jurors called for individual acceptance or challenge, only two were Negroes. Under all the Supreme Court decisions dealing with this question, the mere fact that no Negroes are included on the particular trial jury, or are on a particular Grand Jury, is not sufficient to show racial discrimination in the constitution of the juries. There is no absolute constitutional right to a mixed jury of whites and Negroes in the trial of Negroes, or of citizens and aliens in the trial of an alien. State of Virginia v. Rives, 100 U.S. 313, 322, 25 L.Ed. 667; Neal v. Delaware, 103 U.S. 370, 394, 26 L.Ed. 567; Martin v.

State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497; Md.Code, Art. 51, § 18. Indeed the contrary is not now asserted by counsel for these petitioners. They do, however, point to some special circumstances in the present case which they urge are sufficient to justify determination by this court of the substantial constitutional point despite its inadequate presentation in the State prosecution. Attention is called to the fact that the defendants in the State case were indigent, that the trial judge had appointed counsel for them at public expense, that their counsel were without funds to incur unusual expenses in the preparation for trial or appeal, and that the objection made in the trial court to the constitution of the Petit Jury must be considered to have implicitly included the background of facts now relied on here with respect to the method of selecting juries by the Supreme Bench of Baltimore City, as the trial judge was thoroughly familiar therewith; and that when on appeal the necessity for including the background of facts in the record became important they unsuccessfully endeavored to have them included by stipulation. On the other hand it may be thought that failure of counsel for the defendant to have developed more fully in the trial court their objection to the Petit Jury panel may have been due to reasons of policy rather than inability, and that the background of facts was as readily available then as now without substantial expense. But however that may be, counsel for the respondent here contend that the principle which forbids a collateral attack on the State court proceeding in such a case is too important to be ignored even by reason of the somewhat exceptional circumstances of the present case. And I find the authorities strongly support this view. Thus in Martin v. State of Texas, 200 U.S. 316, 321, 26 S.Ct. 338, 339, 50 L.Ed. 497, it was said:

"Whether such discrimination was practised in this court could have been manifested only by proof overcoming the denial on the part of the state of the facts set out in the written motions to quash. The absence of any such proof from the record in this case is fatal to the charge of the accused that his rights under the 14th Amendment were violated."

And in Morton v. Henderson, Warden, 5 Cir., 123 F.2d 48, 49, the court said:

"Defenses based on federal rights must be shown to have been inadequately protected in the state court, not merely inadequately presented, before resort may be had to the remedy of habeas corpus in the federal courts."

See also Andrews v. Swartz, 156 U.S. 272, 15 S.Ct. 389, 39 L.Ed. 422; Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969; Carruthers v. Reed, 8 Cir., 102 F.2d 933, 938; Bracey v. Zerbst, Warden, 10 Cir., 93 F.2d 8. The necessary conclusion is that the writ must be dismissed on this procedural ground.

■ And the same conclusion results upon consideration of the legal merits of the substantial point. On this the facts have undoubtedly been very fully developed by the testimony in this case. The burden of proof was clearly upon the petitioners to show that they had been denied equal protection of the laws by the intentional, arbitrary and systematic exclusion of Negroes from the jury panels. The basis of the constitutional right as asserted in this case is in the 14th Amendment which provides that: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws". And this constitutional command has been made more specific by Act of Congress of March 1, 1875, c. 114, 8 U.S.C.A. § 44, which provides: "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grant or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude." The extent of the protection afforded by the 14th Amendment to Negroes accused of crime in State courts was soon after its adoption interpreted and applied by the Supreme Court in State of Virginia v. Rives, 1879, 100 U.S. 313, 322, 25 L.Ed. 667, where the court said:

"It is a right to which every colored man is entitled that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the State court, viz. a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by any Federal statute. It is not, therefore, guaranteed by the Four-

teenth Amendment, or within the purview of sect. 641."

This early pronouncement of the Supreme Court was shortly thereafter reiterated in Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567, and has again been restated in recent cases. Pierre v. State of Louisiana, 306 U.S. 354, 362, 59 S.Ct. 536, 83 L.Ed. 757; Hill v. Texas, supra. In the more recent cases in which the Supreme Court has held invalid state convictions of Negroes by reason of racial discrimination in the composition of juries, there has been found by the court, by its own appraisal of the evidence, that there was an intentional or arbitrary and systematic exclusion, total or practically total, of all Negroes from the juries. Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Pierre v. State of Louisiana, supra; Smith v. State of Texas, 311 U. S. 128, 61 S.Ct. 164, 84 L.Ed 84; Hill v. Texas, supra.

Thus the constitutional question in this case is whether the facts fairly show systematic, intentional or arbitrary practical exclusion of Negroes from juries by the long prevailing and present practice of the Supreme Bench of Baltimore City. The petitioners have failed to affirmatively show this condition to exist. While the comparatively small percentage of colored jurors actually serving on Baltimore City juries may be thought from the mere statistics to raise a prima facie presumption of discrimination, the testimony of Judges Dennis and McLanahan and of Mr. Folger, the jury clerk, fairly rebuts the presumption. It appears from the evidence that while the colored population of Baltimore is nearly 20% of the total population, the percentage of qualified Negro jurors to all available jurors is probably much less; and it is conceded by counsel for the petitioners here that the constitutional question cannot be solved merely on a proportional basis; the evidence must be appraised to determine whether the small percentage of Negroes actually serving as jurors is due to intentional discrimination.

In the Baltimore City statutory scheme of the selection of juries, as actually carried out in practice, there are four successive steps in the selection of particular jury panels. (1) The jury clerk first obtains the names of possible jurors; (2) the persons so named are summoned to appear before the Jury Judge who from their written and oral examination determines whether they are qualified and compellable to serve; (3) from the "service list" of eligible and available jurors thus determined, classified for months of service most convenient for the prospective jurors, the clerk compiles the statutory list of 750 names for the approval of the Supreme Bench, and (4) from the latter list the Grand Jury of 23 names is selected by members of the Bench without lot, and the Petit Jurors in the numbers needed are drawn by lot.

With respect to the Grand Jury, the evidence shows that for many years past there has always been one Negro on it; and it is unnecessary to further consider the question of discrimination in its constitution because no objection thereto in any form was made at the trial.

As to the petit jury, the evidence in the case clearly shows that there was no racial discrimination in the second and fourth steps in its selection, that is, in the action of the jury judge, and the drawing of names by lot from the jury box or wheel. There is no suggestion that the drawing of the names by lot is in any way irregular or unfair. And the uncontradicted testimony is that the jury judge applies the same uniform standards in accepting or rejecting persons as qualified jurors, irrespective of race or color, with the possible exception that at times greater liberality is exercised in accepting as qualified jurors Negroes who are willing to serve; and it appears that the jury judge has made a sincere effort to obtain qualified Negroes for jury service. If, therefore, there has been any intentional discrimination of any kind in the selection of Baltimore juries, it must, upon this analysis of the evidence, be attributable to the jury clerk, for whose actions, of course, the Bench is responsible as a matter of law.

The present jury clerk is an appointee of the Supreme Bench and has served in that capacity since 1925, a period of service longer than that of any except possibly a very few members of the Bench. It appears that possibly for that reason he has been allowed a large initiative by the Bench in the original selection of names for examination by the Jury Judge and the subsequent recommendation of names for the list of 750. Counsel for the petitioners do not charge him with any personal bias or prejudice against Negroes in the performance of his official duties; but they do contend that the comparative-

ly small percentage of Negro jurors actually serving amounts to discrimination in law even though unconscious and unintentional on his part. Their chief criticism is directed to his selection of the list of 750 in that it uniformly contains about 25 Negroes only. But if this list is infected with racial discrimination, the latter must relate back to his original selection of names of prospective jurors for examination by the Jury Judge. As the jury clerk is limited to the "service file" resulting from the action of the Jury Judge, it is clear enough on a percentage basis that there was no unfair exclusion of Negroes by the jury clerk in the composition of the list of 750 names. It appears in evidence that the present "service file" of qualified and eligible prospective jurors contains the names of 653 colored, and 18,901 white persons, a percentage of about 3.5 of colored to all; and there is about the same percentage of Negroes in the list of 750. It will be noted that in the particular jury panels serving in the courts for the three weeks period during which the petitioners here were tried, there was approximately the same percentage of colored jurors whose names had been drawn by lot from the list of 750 for the applicable period. And the particular period is fairly typical of the general practice in that respect over a period of several past years. Therefore it logically results that if the jury clerk unfairly discriminated against Negroes, the discrimination must have existed in the selection of too few names of Negroes to be examined for their jury qualifications. There was no evidence (and very probably none available) to show the comparative numbers of white and colored persons periodically from time to time selected by the jury clerk for examination by the Jury Judge. The testimony of the jury clerk does, however, show in general his course of procedure in obtaining such names. His primary source is the City Directory (which does not designate persons as white or colored), supplemented, however, at times by the telephone directory, the automobile registration book, lists of members of various clubs and organizations and other sources thought reliable. His testimony shows positive efforts to include in the original lists the names of many Negroes. His principal aid in securing them is from the addresses given by the City Directory in neighborhoods known by him to be colored residential districts. He has endeav-

ored to supplement this from other sources of information as to probably eligible colored jurors; but he found it useless in many cases to include the names of many colored citizens qualified for jury service because on inquiry he learned that they were members of professional classes exempt by law or customarily excused upon request by reason of their occupation.

The contention most stressed by counsel for the petitioners is that the jury clerk, without disapproval by the Supreme Bench, has systematically and arbitrarily included in the list of 750 names the names of only 25 Negroes. This practice is said to be arbitrary and systematic in that the number has been uniform and not variable from time to time consequent upon changes in population or economic conditions. In a certain sense the practice may be said to have been systematic in that the number of about 25 in the list of 750 has been uniform for many years; but the inclusion of that number cannot fairly be said to have been arbitrary in the sense that it was adopted and used as a part of an intentional, deliberate or systematic scheme to substantially exclude Negroes from the jury panel. The fair inference would seem to be that it was the intention of the jury clerk to secure from the "service file" a fair proportion of Negroes for each list of 750 rather than to intentionally or systematically exclude them.

Without further review of the evidence in detail, it is sufficient to say that considered as a whole, the petitioners here have not shown that there has been intentional arbitrary or systematic discrimination against Negroes in jury selection either by the Supreme Bench or their appointed jury clerk. No conscious racial prejudice is imputed either to the Judges or the clerk. In view of the substantial number of Negroes who have for years past actually served on juries, it cannot be successfully contended that there has been any systematic exclusion of Negroes, either total or practically total, as found by the Supreme Court in the recent cases where the jury composition has been held constitutionally defective. And even if in this case it should be thought that the comparatively small percentage of Negroes serving as jurors raises a prima facie presumption of racial discrimination, the evidence as a whole rebuts the inference by supplying the reasons for that condition which are consistent with the view that

there has not been unlawful racial discrimination in the practice of selection of juries by the Supreme Bench of Baltimore City.

To support their legal contention, counsel for the petitioners rely chiefly on Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84, where the Supreme Court found the Grand Jury constitutionally defective in that there had been over a period of years practically a total exclusion of Negroes, due to a system of selection accomplished either "ingeniously or ingenuously". But a comparison of the facts of that case with those of this will at once clearly show a marked and material difference. A closer case on the facts is Lee v. State of Maryland, 163 Md. 56, 161 A. 284; Id., 164 Md. 550, 554, 165 A. 614, certiorari denied 290 U.S. 639, 54 S.Ct. 56, 78 L. Ed. 555. That case involved the petit jury system in Baltimore County (a political unit of Maryland distinct from Baltimore City). The local statutes required the judge to select a list of 200 names from the tax and poll lists, from which the particular jury panel was to be selected by lot. On the first appeal in the case, the Court·of Appeals reversed the conviction of the defendant because over a long period of years the judge had not included any Negroes on the list of 200 although there were many Negroes in the County qualified to be jurors. Prior to the second trial of the defendant, the judge in selecting the list of 200 included the names of six Negroes, and the second conviction of the defendant was affirmed, the Court of Appeals holding that the jury was free from constitutional objection; and the Supreme Court denied a petition for certiorari. If tested by the principle of that case it seems clear that the jury in the instant case was free from constitutional objection.

It must, of course, be appreciated the function of this court is merely to appraise the evidence in the case as applicable to the charge of unconstitutional race discrimination in the selection of juries. When it is determined that the evidence does not show this, the judicial function here is at an end. Beyond this, other questions arising in the selection of Baltimore City juries with respect to the number of qualified and available colored jurors and the number actually called for service, are matters committed to the judgment and administration of the Supreme Bench of Baltimore City, as to which it would be entirely inappropriate for this court to express either approval or disapproval.

For these reasons I have concluded that the writs of habeas corpus must be dismissed. Counsel may submit the appropriate order in due course.