ZIMMERMAN *v.* STATE

[No. 177, October Term, 1947.]

*Decided June 16, 1948.*

10

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

J. Cookman Boyd, Jr., with whom were Henry M. Decker, Jr., on the brief, for the appellant.

Richard W. Case, Assistant Attorney General, with whom were Hall Hammond, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City, and Alan H. Murrell, Assistant State's Attorney for Baltimore City, on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The appellant, a negro, was tried and convicted of murder in the first degree, in the Criminal Court of Baltimore City, and sentenced to life imprisonment. Through his counsel, appointed by the court, he filed a motion to quash the indictment on the ground that the Grand Jury which returned the indictment was not selected in accordance with the laws of Maryland, and that the method of selection violated the appellant's rights under the Federal Constitution. U. S. C. A. Const. Amend. 14. The appeal challenges the correctness of the court's ruling in refusing this motion, and also the rulings of the court in excluding evidence offered in support of the motion.

The Charter and Public Local Laws of Baltimore City (1938 Ed.) prescribe the method of selecting grand and petit jurors. § 687 provides: "The Judges of the Supreme Bench of Baltimore City, or a majority of them, shall * * * select fairly and impartially, and by the exercise of their best judgment, the names of seven

hundred and fifty persons, or thereabout, qualified under the laws of this State to be grand and petit jurors in the City of Baltimore. * * *". § 689 provides: "The said list of persons, qualified under the laws of this State to be grand and petit jurors in the City of Baltimore, having been prepared as aforesaid, it shall be the duty of the said Judges of the Supreme Bench of Baltimore City, or a majority of them, * * * to select from said list the names of twenty-three persons, who shall constitute and be the grand jurors for the City of Baltimore for the ensuing term of said Criminal Court of Baltimore; * * *." § 694 provides: "The said Judges of the Supreme Bench * * * shall * * * after the selection of the grand juries for the City of Baltimore, as provided in Section 689, cause all the names selected by the Judges as aforesaid, remaining upon said list of qualified jurors, to be inscribed upon ballots, which * * * shall be placed by one of such Judges, with his own hands, on the day of said meeting and immediately before the drawing herein provided for, in a drawing wheel provided for that purpose by the Sheriff of Baltimore City, under the direction of said Judges; * * *." From four to five hundred names are thus drawn by lot to serve upon the petit juries.

It may be noted that the Judges are directed to "select" the Grand Jury. This provision was adopted by ch. 67 of the Acts of 1882. Prior to that time, the names were drawn from a wheel, the first twenty-three constituting the grand jury, a practice which prevails in most of the counties. Compare Code, Art. 51, § 10. We may assume that the change was designed to improve the quality of the grand juries and obtain the services of competent and impartial persons to exercise the important dual functions of passing upon all serious charges of crime and investigating the operation of the penal, law enforcement and other public institutions and agencies of a large urban community. After selection, the Grand Jury serves for a period of four months, whereas the petit juries serve for only three weeks.

12

As shown by the testimony, the practice has departed somewhat from the procedure outlined in the Statute. For many years a special jury clerk has been employed to prepare and keep up to date a jury service file containing the names of some 18,000 eligible residents, who are carefully selected from tax lists, voting lists, the telephone book, the automobile book, and the City Directory. Persons so selected are summoned to appear before one of the Judges of the Supreme Bench, designated as Jury Judge, for examination as to their qualifications. (Rule 1 of the Supreme Bench). Upon approval, their names, with all pertinent information, are put in a card index system. Prior to the commencement of each term of the criminal court, the jury clerk selects from the file and presents to the Supreme Bench a list of seven hundred and fifty names.

Each of the eleven Judges of the Supreme Bench also submits to the Chief Judge, prior to the commencement of each term, nominations of persons known to him to be qualified, which may vary in number from two to fifteen. This composit list, which varies from 42 to 62 names, is turned over to the jury clerk, who checks their age, occupation, residence, race, prior jury service and other like information. This list of nominations is then returned to the Chief Judge. Selections for the grand jury are made from this list, or from the list of 750 names above mentioned, by unanimous action of the Judges. In case any of the twenty three persons selected requests to be excused from serving, the request is customarily granted, and another meeting is called to fill the vacancy.

The appellant was indicted by the Grand Jury for the May Term, 1946. As originally selected, it contained the names of two negroes, both of whom requested to be excused from serving. At a special meeting, a white man and a negro were selected to fill the vacancies. All of the twenty-three persons who served had previously been listed in the jury service file. After selection, the names published contained no designation as to race, nor

did the list of petit jurors drawn from the wheel. There was, however, a designation of race upon the original lists.

The appellant contends that the record shows that the statute was not complied with, because selection is customarily made from the list of nominations, rather than from the list of 750 names prescribed by the Statute. In every instance since 1940, it was shown that the names ultimately selected for Grand Jury service appeared on the list of nominations, although in a few instances the names also appeared on the list of 750. We think the objection is without merit.

§ 709 of the Charter provides that "all the provisions * * * relating to the mode of drawing and summoning jurors shall be construed as directory merely, and no indictment * * * shall be quashed * * * because of any failure by the Judges, or the Clerks, or the Sheriff, to comply with the provision of law relating to the drawing of jurors in the City of Baltimore; * * *". Even in the absence of such a provision, this court has held that statutory provisions relating to the selection of a grand or petit jury are directory. *King v. State*, 190 Md. 361, 58 A. 2d 663, and cases there cited. The statute imposes a duty of personal selection upon the Judges, and if, in the performance of that duty, an investigation and preparation is made in advance of the meeting and consideration of the larger list, we think there is substantial compliance with the statutory object. The statute, adopted prior to the time when the Supreme Bench established the jury service file under the supervision of the Jury Judge and Jury Clerk, contemplated personal selection by the Judges, or a majority of them, of each name upon the list of 750. Personal selection of the Grand Jury from a smaller list does not do violence to the statutory scheme, but makes that scheme more workable.

The appellant states in his brief that he does not "seek to have the indictment * * * quashed solely because of noncompliance with the charter provision",

but contends that non-compliance ."has been one of the factors permitting * * * discrimination against negroes". We think, however, that in considering the question of discrimination, the answer cannot depend upon the mere size of the list from which the selection is made. The possibility of discrimination would seem to be present in either case.

The main point urged by the appellant is that the record shows an intentional and systematic limitation in the number of Negroes serving upon Grand Juries in Baltimore City, and that this constitutes discrimination, in violation of the equal protection clause of the 14th amendment to the Federal Constitution. There can be no doubt that where the evidence shows a total exclusion of negroes, prejudice may be inferred. *Jackson v. State,* 180 Md. 658, 26 A. 2d 815; *Lee v. State,* 163 Md. 56, 161 A. 284; *Lee v. State,* 164 Md. 550, 165 A. 614, certiorari denied 290 U. S. 639, 54 S. Ct. 56, 78 L. Ed. 555. In the first Lee case, the Court, speaking through Chief Judge Bond, said, 163 Md. page 66, 161 A. page 288, with reference to the selection of petit jurors by the Jury Judge in Baltimore County: "His system of drawing jurors begins with a collection of names of white eligibles, and hence is confined from the beginning to the selection of white men. Only the white men appear to have been looked to for jurors. The evidence, with the long, unbroken absence of negroes from the juries selected, seems to show an established practice, confining selections to white men as effectually as if such a restriction were prescribed by statute. And this court has concluded that this, under the authorities, amounts to unconstitutional exclusion of negroes." Citing *Commonwealth of Virginia v. Rives,* 100 U. S. 313, 25 L. Ed. 667, *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567, and *Carter v. Texas,* 177 U. S. 442, 20 S. Ct. 687, 44 L. Ed. 839. In the second Lee case, where the names of six negroes were included in the panel of 200, it was held that no discrimination was shown.

The appellant contends, however, that under the recent decision of the Supreme Court limitation in the number of negroes selected is as offensive as total exclusion. In *Akins v. Texas*, 1945, 325 U. S. 398, 65 C. Ct. 1276, 1277, 89 L. Ed. 1692, the Supreme Court, speaking through Mr. Justice Reed, said: "This discrimination was said to consist of an arbitrary and purposeful limitation by the Grand Jury Commissioners of the number of negroes to one who was to be placed upon the grand jury panel of sixteen for the term of court at which the indictment against petitioner was found. This is petitioner's only complaint as to racial discrimination." The Court pointed out that the petitioner was not entitled to proportional racial representation upon the jury, but only to require that it be selected without discrimination against his race. Although there was testimony from the three Jury Commissioners that they intended to select, and did select, only one negro upon that panel, the court was "unconvinced that the commissioners deliberately and intentionally limited the number of negroes on the grand jury list." The court said: "This conclusion makes it unnecessary to decide whether a purposeful limitation of jurors by race to the approximate proportion that the eligible jurymen of the race so limited bears to the total eligibles is invalid under the Fourteenth Amendment." In his dissenting opinion, Mr. Justice Murphy said: "Racial limitation no less than racial exclusion in the formation of juries is an evil condemned by the equal protection clause." He also said: "If a jury is to be fairly chosen from a cross section of the community, it must be done without limiting the number of persons of a particular color, racial background or faith, all of which are irrelevant factors in setting qualifications for jurors. This may in a particular instance result in the selection of one, six, twelve or even no Negroes on a jury panel."

Whatever the exact scope of the decision in the Akins case, we think the majority opinion recognized that selection, other than by lot, is not a valid objection. In

dealing with the Texas statute providing for personal selection by jury commissioners, the Court said, 325 U. S. page 402, 65 S. Ct. 1279, 89 L. Ed. 1692: "This method of selection leaves a wide range of choice to the commissioners. Its validity, however, has been accepted by this Court. *Smith v. Texas, supra,* 311 U. S. 128 130, 61 S. Ct. 164, 165, 85 L. Ed. 84. Petitioner does not attack it now. Its alternative would be a list composed of all eligibles within the trial court's jurisdiction and selection of the panel by lot." This view seems to be supported by the later decisions of *Fay v. New York,* 332 U. S. 261, 67 St. Ct. 1613, 91 L. Ed. 2043, and *Moore v. New York,* 333 U. S. 565, 68 St. Ct. 705, 92 L. Ed. 881. We find nothing in these decisions, except the intimation in the dissenting opinions, to indicate that chance, and chance alone, must determine the composition of a particular jury. And while the question whether a deliberate policy of proportional representation would vitiate a particular panel, was left open in the Akins case, we think the proof of such a policy is lacking in the case at bar.

Chief Judge Smith testified that since his appointment as chief judge in September, 1944, seven grand juries were selected, to and including the May term, 1946. During that period the nominations of the judges for each panel varied from 43 to 54, while the number of Negroes nominated varied from two to six, the number nominated for the May Term, 1946, being six out of fifty. During that period eleven Negroes were selected to serve, and nine did serve. Edward J. Folger, Jury Clerk, testified that prior to 1944 he usually put the names of about 25 Negroes on the list of 750, but since 1944, he had put from 40 to 60. The list for the May term, 1946, contained the names of 50 Negroes. From 1910 to 1944, his records show that one Negro served on every Grand Jury.

The appellant called former Chief Judge Dennis, who served from 1928 until August 1944, as a witness, and offered to prove by him that during that period it was

the established practice of the Supreme Bench to limit the Negro members of the Grand Jury to one, "no more than one, and not less than one." He made the same proffer of testimony from three other retired Judges serving prior to 1944. This testimony was excluded, on the ground that there was no offer to show that the same practice continued after 1944.

For the purposes of this appeal we shall treat the evidence proffered as though it had been admitted. Mr. Folger's testimony that one, and only one, Negro served upon each Grand Jury from 1910 to 1944, would doubtless support an inference that this result was not obtained by chance, but was dictated by policy. But any inference based on a mere numerical pattern is rebutted by the undisputed evidence that two negroes served upon each of two Grand Juries in 1945, and that the Grand Jury for the May Term, 1946, originally contained the names of two Negroes who were excused from serving. The method which has produced a variable pattern since 1944 is clearly not the same method as that which produced a uniform pattern in previous years. If a policy of limitation was followed before 1944, it was obviously discontinued in 1945 and 1946.

The appellant lays stress upon the conceded fact that Negroes constitute about 19% of the total population of the City. But that fact throws little light upon the proportion of eligibles. In *U. S. ex rel. Jackson v. Brady,* D. C. 1942, 47 F. Supp. 362, 365, Judge Chesnut, sitting in the District Court, considered the question whether there had been a systematic exclusion of eligible Negroes from the petit juries in Baltimore City. He said: "The evidence shows that while the proportion of the colored population to the white is about 20 per cent, the percentage of Negroes qualified, able and willing to serve as jurors is probably much less in proportion to the whole number of white persons qualified and available as possible jurors. Many Negroes (probably the older ones) do not have sufficient educational qualifications; until recently a very large proportion in comparison to the

white population has been on relief; the percentage of conviction of crime of Negroes is unfortunately higher than that of the whites; and many otherwise qualified Negroes are exempt or excused from service on account of their occupation, either professional or industrial." He found as a fact that the jury service file, in 1941 and 1942, contained the names of 18,901 whites and 653 Negroes, a proportion of 3.34%; that the list of 750 names contained the names of only 25 Negroes, and that the panel of 50 from which the petit jury was selected contained the names of only two Negroes. He found no evidence of discrimination in these facts. This ruling was affirmed on appeal. 4 Cir., 133 F. 2d 476, *certiorari* denied 319 U. S. 746, 63 S. Ct. 1029, 87 L. Ed. 1702. The same point was made in *Lee v. State,* 163 Md. 56, 63, 161 A. 284, 287, where it was shown that the Negro population of Baltimore County was about 10% of the total. The court said: "But it should be remembered that these numbers do not present an accurate statement of the proportion of eligible negroes, because of differences in the economic and other conditions of the two races. There is a much larger proportion of the negroes than of the whites in the class of workers who could serve on juries only at the cost of a prohibitive sacrifice of earnings and employment."

In the case at bar there was no evidence of the proportion of Negroes upon the jury service list, but there was evidence that the names of 50 Negroes were placed on the list of 750, a proportion of 7½%. The appellant has not challenged the validity of that list. The proportion of Negroes upon the list of nominations for the Grand Jury was 6 out of 50, or 12%. Out of 23 persons originally selected to serve, 2 were Negroes. These facts tend to corroborate, not to impeach, the testimony of Chief Judge Smith and the other Judges who testified, that there was no discrimination against Negroes.

In the absence of proof of a long continued and invariable practice, the fact that only one Negro served on the particular jury is without significance. *Akins v.*

*Texas, supra.* We think the appellant has failed to meet the burden of establishing a deliberate and intentional limitation on account of race or color, in the selection of the Grand Jury which indicted him, and that the finding of the trial court was supported by the weight of the evidence.

The appellant contends that the trial court erred in declining to sign an order permitting him to prosecute this appeal at the expense of the State. Code, Art. 5, § 88A, as enacted by ch. 1068 of the Acts of 1945, Code Supp. 1947, Art. 5, § 88A, authorizes an appeal *in forma pauperis* "in any case where a sentence of death is imposed." This section is clearly not applicable. We know of no other statute, or rule of court, which would authorize the passage of such an order. Even in a *habeas corpus* case, where the statute (Code Supp. 1947, Art. 42, § 3C) permits the waiver of costs, we have denied an application for appeal *in forma pauperis*. *Olewiler v. Brady,* 185 Md. 341, 348, 44 A. 2d 807. We find no error in the ruling of the trial court, even if such ruling were appealable.

*Judgment affirmed, with costs.*