**UNITED STATES ex rel. JACKSON et al.
v. BRADY, Warden.**

No. 5034.

Circuit Court of Appeals, Fourth Circuit.

Feb. 9, 1943.

Writ of Certiorari Denied May 3, 1943.

See 63 S.Ct. 1029, 87 L.Ed. ——.

C. Arthur Eby, of Baltimore, Md. (William Curran, of Baltimore, Md., on the brief), for appellants.

D. Heyward Hamilton, Jr., Asst. Atty. Gen., and William C. Walsh, Atty. Gen., of Maryland (J. Bernard Wells, State's Atty., and Douglas N. Sharretts and Joseph G. Finnerty, Asst. State's Attys., all of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The appellants, who are Negroes, complain of the dismissal by the District Court of their petition for habeas corpus wherein they sought release from a sentence of death imposed by the Criminal Court of Baltimore after a conviction by a jury of murder in the first degree committed in the course of an attempted robbery. The judgment was affirmed on appeal by the Court of Appeals of Maryland. Jackson v. State, 26 A.2d 815. The point now raised is that the defendants in the Criminal Court were deprived of their constitutional rights at the trial in that there was racial discrimination in the selection of the Grand Jury which indicted, and the Petit Jury which tried and convicted them.

The defendants were without means to employ counsel, and the Criminal Court therefore appointed three able and experienced lawyers, one for each of the defendants, whose earnest efforts on their clients' behalf were indicated by their voluntary payment, at their own expense, of the cost of a large record in the Court of Appeals. The defendants did not ask for a severance, but were tried jointly before a jury. At the beginning of the trial the jurymen on the regular panel in the Criminal Court were sworn on their voir dire and examined by counsel, and as the result of peremptory challenges and challenges for cause the whole panel was exhausted. Additional jurymen were then successively brought from three other courts in Baltimore, and similarly examined and challenged, and at the end of the examination eight jurors only had been chosen. More jurymen were then brought in, and thereupon counsel for the defendants, pointing out that of fifty-two jurymen submitted to them only two were colored, challenged the array on the ground that the jury had not been selected in accordance with the Constitution of the United States or the Constitution and laws of Maryland. No evidence or argument was offered to sustain the charge and it was overruled by the court. This action formed the basis of one of the objections considered on appeal, but it was overruled by the Court of Appeals on the ground that prejudice could not be assumed from the presence of only two Negroes on a list of fifty-two jurymen, but must be proved by substantial evidence tending to show that Negroes were intentionally excluded in the formation of the jury panel. No objection was made at any time in the trial or in the appellate court as to the mode of selection of the Grand Jury.

The opinion of the Court of Appeals was filed on June 17, 1942, and later the Governor of Maryland appointed October 2, 1942, as the date of execution of sentence. The petition for habeas corpus was filed in the District Court on October 1, 1942 after application for a writ to a State judge had been refused on the same day. From the denial of the writ of habeas corpus by a State judge no appeal lies to the Court of Appeals under the law of Maryland. Betts v. Brady, 316 U.S. 455, 460, 62 S.Ct. 1252, 86 L.Ed. 1595.

There is no charge that Negroes are discriminated against for jury service by the Constitution or laws of the State; the complaint relates to the method by which the laws have been executed. The record on appeal contains a full description of the mode of selection of jurors in Baltimore, accompanied by the testimony of the Chief Judge and an Associate Judge of the Supreme Bench of Baltimore City, the court of superior jurisdiction in the city, and by the testimony of the clerical official under whose supervision the work is done. Detailed findings of fact and conclusions of law, accompanied by an exhaustive opinion, were filed by the District Judge. 47 F. Supp. 362. Summarizing the findings of fact it appears that in accordance with the statute law of the State a list of seven hundred and fifty persons qualified for jury service is selected by the judges of the Supreme Bench in the following manner: A jury clerk obtains the names of prospective jurymen from city and telephone directories and other reliable sources and summons them to appear for examination as to their qualifications before a member of the Supreme Bench called the Jury Judge. He either accepts or rejects them after they have filled in the answers to a written questionnaire and he has personally examined them. A service file is made up of the names of the persons accepted, from which the clerk takes from time to time as needed seven hundred and fifty names and submits them to the Bench, and from them the names of four or five hundred persons, as needed, are drawn by chance from a wheel for service as petit jurors in the courts of the city. In addition, the members of the Bench at each term of court personally select twenty-three persons believed to be of good character and of more than average intelligence to serve on the Grand Jury.

In 1942 the service file was made up of the names of 18,901 white and 653 colored persons, so that the latter comprised approximately 3.34 per cent of the whole. Over a period of years the number of colored jurors has varied from one to four per cent of the whole. At the time of the trial of the case in the Criminal Court there were seven jury panels of twenty-five each in the courts of the city, containing eight Negroes out of a total of one hundred and seventy-five men. The Grand Jury has always contained one colored juror.

It is not suggested that any one engaged in the selection of jurors in Baltimore is actuated by a conscious personal bias against Negroes; but it is pointed out that the colored population, according to the 1940 census, was approximately nineteen per cent of the whole population, and it is contended that racial discrimination must be presumed from the contrast between this figure and the small percentage of Negroes actually in jury service. Other facts found by the District Judge must be considered in weighing this argument. The names of jurors in the service file are kept on cards which are classified by months selected by the jurors themselves as most convenient for service. For convenience white cards are used for white jurors, brown cards for colored jurors, pink cards to indicate military service, and blue cards to indicate disability. When the jury clerk draws seven hundred and fifty names from the service file for submission to the Supreme Bench, the list always contains the name of twenty-five colored persons, in other words, approximately the same percentage of Negroes as is found in the whole service list. Consequently there is no numerical discrimination against Negroes at this point, and discrimination, if it exists, must be found in the method by which the names are selected and placed on the service list. It appears from the record in the pending case that in selecting names from directories and from other sources, the jury clerk takes pains to select names of persons who live in that large section of Baltimore City occupied exclusively by colored persons and also makes use of lists of members of colored clubs and associations. The evidence, however, fails to show how many of the persons notified to appear for examination by the Jury Judge are Negroes or what percentage of persons rejected by the Judge are of the colored race. There is evidence, however, from which it may be inferred that the percentage of rejections for normal causes is greater amongst Negroes than amongst whites. The District Judge found that of the persons in Baltimore City twenty-five years of age who have completed seven or eight years of grade school, sixty per cent are whites and twenty per cent colored, and of those who have completed high school or some part thereof twenty-two per cent are white and eight per cent are colored. It has been the policy of the Supreme Bench to exclude from service persons on relief, and in recent years a very large proportion of Negroes in comparison to the white population has been on relief. The percentage of convictions for crime of Negroes is higher than that of whites. Moreover, the Jury Judges have found it difficult to secure the service of qualified Negroes, many of whom present excuses based on professional or industrial occupations. Two judges of the Supreme Bench testified that, unless it is necessary, it is not the custom in Baltimore to compel jury service from professional men or from small business men or industrial workers, white or colored, whose service would entail financial sacrifice. The judges and the jury clerk also testified without contradiction that there has been no systematic or arbitrary exclusion of Negroes because of their race but, on the contrary, a positive effort, especially by the jury judges, to obtain the service of qualified Negro jurors.

The District Judge found from the evidence the ultimate fact "that there has been no intentional and systematic exclusion of Negroes from juries in Baltimore City; and no discrimination against them in practice on account of race and color in the selection of jurors by the Supreme Bench of Baltimore City"; and he reached the conclusion of law that the petition for the writ of habeas corpus should be dismissed (1) on the substantial ground that racial discrimination against Negroes for jury service had not been shown, and (2) on the procedural ground that the petitioners, when represented by competent counsel in the trial of their case in the State court, did not interpose any objection to the constitution of the Grand Jury; and did not submit any evidence in support of their charge of racial discrimination against Negroes in the composition of the Petit Juries and therefore must be held to have waived that objection.

■ The law to be applied in this case is not in dispute. It has long been established that under the prohibition contained

in the Fourteenth Amendment of the Federal Constitution a State may not deprive a colored citizen of the right to which he is entitled "that, in the selection of jurors to pass upon his life, liberty or property, there shall be no exclusion of his race, and no discrimination against them because of their color". State of Virginia v. Rives, 100 U.S. 313, 322, 25 L.Ed. 667; Neal v. Delaware, 103 U.S. 370, 394, 26 L.Ed. 567. This rule has been frequently applied and was recently given effect in Hill v. Texas, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559, where the duty of the federal courts in such a situation was outlined in the following terms: "A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for Texas may indict and try him again by the procedure which conforms to constitutional requirements. But no state is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty. Tumey v. [State of] Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749, 50 A.L.R. 1243. It is the state's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the state's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the state must respect, the benefits of which every person may demand. Not the least merit of our constitutional system is that its safeguards extend to all— the least deserving as well as the most virtuous."

A salutary warning on this subject was given to the courts on September 8, 1942, in the report to the Conference of the Chief Justice with the Senior Circuit Judges of the United States by a Committee on Selection of Jurors, composed of District Judges of the United States. The report states (pp. 18, 20):

"In each district where there is a large Negro or other minority racial group the problem of selecting a suitable number of qualified representatives of that race is one which should receive the careful consideration of the clerk and jury commissioner. The Constitution, together with statutes and decisions, make it evident that anything that amounts to a conscious and deliberate exclusion from jury lists of representatives of any class of persons solely on account of race, color, economic, or social status is improper and may be unlawful. The selection of qualified persons to give adequate representation to certain groups may in some districts present difficulties. Nevertheless, no jury panel can be regarded as secure from challenge unless there has been an earnest effort on the part of the court, the clerk, and the jury commissioner to assure that there is no discrimination against these groups.

\* \* \* \* \* \*

"Since the 'Scottsboro' cases, it has been the practice in several courts to include in the jury boxes the names of a few Negroes to avoid the violations of the Fourteenth Amendment. The validity of this method may be questioned in the light of the Supreme Court's language in the case of Smith v. State of Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84".

In the last mentioned case, which considered the composition of the Grand Jury challenged by one convicted of crime, the number of Negroes called for service and actually permitted to serve for a long time had been so scanty as to compel the conclusion that Negroes had been arbitrarily and systematically excluded because of their race. In the pending case, considering the number of Negro jurymen in service in Baltimore during a long period of years in comparison with the substantial size of the Negro population, and taking this fact separate and apart from the surrounding circumstances, one might be disposed to infer that an intentional and systematic effort had been made to cut down the number of Negro jurymen in such a fashion as to create the superficial appearance of obeying the constitutional mandates while actually ignoring them.

But a careful examination of all the facts in the record before us demonstrates that such a deduction is not warranted and supports the findings of fact and conclusions of law of the District

Judge. Except as to the Grand Jury, whose organization was not challenged in this case, no discrimination can be found, even when attention is confined to comparative percentages alone, in the number of Negroes drawn for the juries in Baltimore from the established service list. Discrimination, if any exists, must occur in the selection of persons notified by the Jury Clerk to appear in court for examination by the Jury Judge. But such discrimination was not charged by any one at the hearing on the petition for the writ, and no one inquired into the relative numbers of white and colored persons subjected to the preliminary inquiry. On the other hand, we have the uncontradicted testimony of the Jury Clerk of special efforts on his part to bring in persons from the residential centers of the Negro population, and the uncontradicted evidence of the judges of the difficulties encountered in securing the attendance of colored persons for jury service; and all of this testimony is supported by statistics which bring out the disqualifying handicaps under which a disproportionate part of the colored race is still laboring. The ultimate fact found by the District Judge was indicated by the evidence before him; and the petitioners did not meet the burden which rests upon a prisoner who seeks release on habeas corpus of proving by a preponderance of evidence the facts which he claims entitle him to a discharge. See, Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497; Walker v. Johnston, 312 U.S. 275, 286, 61 S.Ct. 574, 85 L.Ed. 830.

■ The second ground upon which the decision below was based was also well taken, that is, the defendants in the Criminal Court made no effort to sustain, and, therefore, waived the charge of racial discrimination after they had presented it. As we have seen, the defendants made no objection whatever in the Criminal Court to the constitution of the Grand Jury, and confined their objection to the Petit Jury to an oral challenge of the array on the ground that the jurors had not been selected in accordance with the Constitution, because only two of the fifty-two jurors submitted for membership on the trial panel were colored. No further offer of proof and no argument to support the challenge were made. The bare recital of these facts demonstrates that nothing was shown at the trial in the Criminal Court to justify a ruling that the jury was disqualified on constitutional grounds. The only fact shown

was insufficient to indicate racial discrimination in defiance of the Constitution; for it is well established that a colored citizen charged with crime cannot claim as a constitutional right that his race be represented on the trial jury, and the mere absence of Negroes from the jury does not prove that they were excluded because of their race. See, State of Virginia v. Rives, 100 U.S. 313, 322, 25 L.Ed. 667; Neal v. Delaware, 103 U.S. 370, 394, 26 L.Ed. 567; Martin v. State of Texas, 200 U.S. 316, 320, 26 S.Ct. 338, 50 L.Ed. 497.

■ The Criminal Court was, therefore, given nothing more than the bare charge of denial of constitutional right without proof or offer of proof to sustain it. In this state of affairs, as the Court of Appeals of Maryland held, the trial court was clearly right in overruling the objection. In Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497, the court overruled a motion to quash the indictment based on the ground that Negroes had been excluded from the Grand Jury because of their race in a county in which one-fourth of the persons qualified to serve were Negroes. The accused offered no evidence whatever to prove racial discrimination. The Supreme Court said (200 U.S. at page 320, 26 S.Ct. at page 339, 50 L.Ed. 497): "A different conclusion in this case would mean that, in a criminal prosecution of a Negro for crime, an allegation of discrimination against the African race because of their race could be established by simply proving that no one of that race was on the grand jury that returned the indictment, or on the petit jury that tried the accused; whereas, a mixed jury, some of which shall be of the same race with the accused, cannot be demanded, as of right, in any case; nor is a jury of that character guaranteed by the 14th Amendment. What an accused is entitled to demand, under the Constitution of the United States, is that, in organizing the grand jury as well as in the impaneling of the petit jury, there shall be no exclusion of his race, and no discrimination against them, because of their race or color. [State of] Virginia v. Rives, 100 U.S. 313, 323, 25 L.Ed. 667, 671; In re Wood, 140 U.S. 278, 285, 11 S. Ct. 738, 35 L.Ed. 505, 508. Whether such discrimination was practised in this case could have been manifested only by proof overcoming the denial on the part of the state of the facts set out in the written motions to quash. The absence of any such proof from the record in this case is fatal

to the charge of the accused that his rights under the 14th Amendment were violated."

See also Glasser v. United States, 315 U. S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680.

The facts presented to the District Court on hearing on habeas corpus were not hidden or unknown at the time of the trial in the Criminal Court. They were as easily accessible when the charge of racial discrimination was formally made during the selection of the jury as they were later; and the failure of experienced counsel, for reasons of their own, to offer the necessary proof to support the charge was as deliberate and effective a waiver as if the point had not been made at all. That a defendant, especially when represented by counsel, may make a competent and intelligent waiver of a constitutional right binding upon him is well established by repeated decisions. So it has been held, not only with respect to the right of a jury selected without racial discrimination but also as to the right to be represented by counsel, the right to a jury trial and the right not to testify as a witness upon the trial of a criminal charge. Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A. L.R. 263; Adams v. United States, 63 S. Ct. 236, 87 L.Ed. ——; Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461; Cundiff v. Nicholson, 4 Cir., 107 F. 2d 162; Howard v. United States, 58 App. D.C. 179, 26 F.2d 551; Bracey v. Zerbst, 10 Cir., 93 F.2d 8; Carruthers v. Read, 8 Cir., 102 F.2d 933, certiorari denied 307 U. S. 643, 59 S.Ct. 1047, 83 L.Ed. 1523.

There is especial justification for applying the doctrine of waiver when a defendant raises a constitutional point effectively for the first time on petition for a writ of habeas corpus in the federal court after he has been convicted of crime in the State court and the conviction has been upheld by the highest court of the State. It has been decided many times that it is only in exceptional cases, differing in character from the pending case, that the Federal courts will interfere by habeas corpus with the final administration of criminal justice by the courts of the State; and since it is the duty of every State, and one not likely to be ignored, to provide corrective judicial process for persons convicted of crime without due process of law, the federal courts may not be asked to issue the writ of habeas corpus on behalf of a person held under a State commitment until the remedies afforded by the State courts have been exhausted. This procedure is designed to eliminate conflicts between the State and Federal courts, and especially to avoid the unseemly situation which occurs when a lower Federal court is asked to set aside the deliberate judgment or order of the highest court of a State. Surely, such a request should not be granted on the petition of a defendant in the State court who has had full opportunity to raise his objection during his trial in that tribunal but has failed to do so. So it was held in Ex parte Spencer, 228 U.S. 652, 33 S.Ct. 709, 57 L.Ed. 1010, with regard to a charge raised for the first time in the Federal court, that the State court had imposed an illegal sentence upon the petitioner. The court said (228 U.S. at pages 660, 661, 33 S.Ct. at page 711, 57 L.Ed. 1010): "It is true the rule has been announced in cases where habeas corpus was applied for in advance of final decision in the state courts; but the principle of the rule applies as well after decision. The rule would be useless except to enforce a temporary delay, if it did not compel a review of the question in the state court, and, in the event of an adverse decision, the prosecution of error from this court. In other words, if it gave freedom to omit such defenses in the state court and subsequent review by this court, and yet the accused have an absolute right to habeas corpus. And this case shows the necessity of the application of the rule. We have pointed out the opportunity petitioners had to object to their sentences when they were imposed, and successively to attack their validity in the appellate tribunals of the state and in this court. And this satisfies justice. More than this, that for which petitioners contend, will make unstable and uncertain the administration of the criminal laws of the states. If defenses may be omitted at trials, rights of review omitted, and yet availed of through habeas corpus, the whole course of criminal justice will be deranged, and, it may be, defeated."

In a number of cases it has been held that if the point upon which the petition for the writ of habeas corpus is based has been raised and decided adversely in the State courts, the decision, except in extraordinary cases, is res adjudicata and may not be reviewed on habeas corpus in the Federal court. Andrews v. Swartz, 156 U. S. 272, 15 S.Ct. 389, 39 L.Ed. 422; Morton v. Henderson, 5 Cir., 123 F.2d 48; Hawk v. Olsen, 8 Cir., 130 F.2d 910.

But we need not go so far in the pending case. It is sufficient to say that the objection of racial discrimination was raised so inadequately in the Criminal Court of Baltimore by the petitioners here, that in effect it was not raised at all and was therefore waived; and it may be added that in any case when the denial of a constitutional right by the courts of a State is charged, the desirable procedure, whenever it is possible, is to apply to the Supreme Court of the United States rather than to seek relief in a District Court of the United States.

There is no reason to doubt that the point now raised by the petitioners for the writ would have received sympathetic consideration, if it had been supported by proof, by the Court of Appeals of Maryland in view of its decisions in Lee v. State, 163 Md. 56, 161 A. 284, and 164 Md. 550, 165 A. 614, in which the constitutional right of a Negro, accused of crime, to a jury selected without discrimination against his race was protected and enforced. Since the petitioners failed to present any proof to support their charge during their trial in the State court, they must be held to have waived the privilege.

It follows that whether the complaint made in the petition for habeas corpus be considered on its merits or from a procedural standpoint, the decision of the District Court must be affirmed.