**UNITED STATES ex rel. BONGIORNO**
**v. RAGEN.**

**No. 111.**

District Court, N. D. Illinois, E. D.

March 28, 1944.

Charles Liebman, of Chicago, Ill., for petitioner.

Hector A. Brouillet, Asst. Atty. Gen., and James V. Cunningham, Asst. State's Atty., of Chicago, Ill., for respondent.

BARNES, District Judge.

In this case, which is now before the court for decision after a hearing on the merits, the petitioner, John Bongiorno, seeks release, upon a writ of habeas corpus, from the Illinois State Penitentiary at Joliet, Illinois, where he is serving a sentence of 199 years, imposed by the Criminal Court of Cook County, Illinois, in September, 1933. The petitioner claims that he is held in custody in violation of the Constitution of the United States.

The respondent has contended throughout the proceeding that this court should not have assumed jurisdiction for the reason that the petitioner failed, before coming to this court, to exhaust his remedies in the State courts by making application for writs of habeas corpus in the courts of Illinois, and, for the further reason, that this is not that "rare" case wherein a Federal court should interfere with the administration of justice in the State courts.

■■ Congress has given the power to Federal District courts to issue writs of habeas corpus in cases where the petitioner claims that he is being held in custody under a State commitment in violation of the Constitution of the United States, Secs. 451, 452, 453, Title 28 U.S.C.A., but, ordinarily, an application for habeas corpus by one detained under a State court judgment of conviction for crime will be entertained by a Federal court only after all State remedies available, including all appellate remedies in the State courts and in the Supreme Court of the United States by appeal or writ of certiorari, have been exhausted. Ex parte Henry Hawk, 64 S.Ct. 448 (opinion filed January 31, 1944); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406; Urquhart v. Brown, 205 U.S. 179, 27 S.Ct. 459, 51 L. Ed. 760; Achtien v. Dowd, 7 Cir., 117 F. 2d 989; Sanderlin v. Smyth, 4 Cir., 138 F.2d 729. In Mooney v. Holohan, supra, it was said that (294 U.S. at page 115, 55 S.Ct. at page 343, 79 L.Ed. 791, 98 A.L.R. 406), "recourse should be had to whatever judicial remedy afforded by the state may still remain open." Another principle, applicable to cases of this character, is that "the due and orderly administration of justice in a state court is not to be thus interfered with save in rare cases where exceptional circumstances of peculiar urgency are shown to exist." United States v. Tyler, 269 U.S. 13, 17, 46 S.Ct. 1, 3, 70 L.Ed. 138.

In October, 1942, the writer of this memorandum received through the mails a letter from one Sam Bongiorno, stating: "My father (John Bongiorno) is an inmate of the Illinois State Penitentiary at Joliet, Ill. He has a petition for a writ of habeas corpus which he has been trying to send to you for the past two years, but the authorities will not let it out. If there is any way in which you can obtain, or aid us in obtaining the release of this petition, it will be very much appreciated." Believing that this communication made it the duty of this court to determine whether John Bongiorno was being denied access to the courts, in violation of his constitutional and statutory rights, the court caused an order to be made on November 27, 1942, reading, in part, as follows:

"It having been represented to the court that John Bongiorno, who is an inmate of the Illinois State Penitentiary at Joliet, Illinois, has sought to file in the office of the clerk of this court a petition for writ of habeas corpus but that the authorities at such penitentiary will not permit the filing of the same;

"It is Ordered that the Warden of the Illinois State Penitentiary at Joliet, Illinois be, and he is hereby, commanded and directed to show cause, if any he has, in writing, on or before the opening of court on December 7, 1942, why the said John Bongiorno should not be permitted to file, in the office of the clerk of this court, a petition for writ of habeas corpus; * * *"

"It is further Ordered that the Honorable Russell Whitman, as chairman of the Committee on Civil Rights of the Chicago Bar Association, and/or such member or members of the Committee * * * as the Honorable Russell Whitman may designate be, and they are, and each of them is, hereby appointed as attorney or attorneys for said John Bongiorno."

The respondent, the warden of the Illinois State Penitentiary at Joliet, Illinois, filed no writing in response to the above-quoted rule. When the matter was called at the opening of court on December 7, 1942, the return day of the rule, the respondent failed to appear, and the court thereupon directed a writ of habeas corpus to issue for John Bongiorno. Later in that morning, the respondent and his counsel

did appear in court, and there made statements which confirmed the charge that it had been the established practice in the Joliet prison not to permit the prisoners themselves to send petitions for writs to any court, and that such practice had existed for more than two years past. Sometime later in the day, the original petition for habeas corpus of Bongiorno was received through the mails from respondent's office, and was filed.

The court concluded that, by reason of these special circumstances, that is, the policy of the State administrative authorities to refuse prisoners the right to send petitions to any court, and, further, the inability of this court to compel the State authorities to permit petitioner to exercise his rights in this respect, the petitioner, as a practical matter, had exhausted his State court remedies, and that this constituted a "rare" case of which this court was required to assume jurisdiction. Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034. While, at the time the court issued the writ in this case, the opinion in the case of Ex parte Henry Hawk, supra [64 S.Ct. 450], had not yet been handed down, the court finds, in the italicized language of the following quotation from that opinion, authority for the action which the court took: "But where resort to state court remedies has failed to afford a full and fair adjudication of the federal contentions raised, either because the state affords no remedy, see Mooney v. Holohan, supra, 294 U.S. [at page] 115, 55 S.Ct. [at page] 343, 79 L.Ed. 791, 98 A.L.R. 406, or *because in the particular case the remedy afforded by state law proves in practice unavailable* or seriously inadequate, cf., Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 [supra]; Ex parte Davis, 318 U.S. 412, 63 S.Ct. 679 [87 L.Ed. 868], a federal court should entertain his petition for habeas corpus, else he would be remediless. In such a case he should proceed in the federal district court before resorting to this Court by petition for habeas corpus."

The court is now, after hearing, required to pass upon the merits of the case.

Briefly stated, the petitioner has sought to establish the following: (1) That his trial took place in an atmosphere so charged with public passion, prejudice and hysteria, as to deprive him of due process of law; (2) that the affirmance by the Supreme Court of Illinois of his conviction was based upon supposed facts and circum-

stances not supported by the record on the writ of error; (3) that he was denied the equal protection of the laws; (4) invalidity of the 199-year sentence; and (5) that the totality of facts in the setting of this case constitute a "denial of fundamental fairness shocking to the universal sense of justice."

In support of petitioner's claim that his trial took place in an atmosphere so charged with public passion, prejudice and hysteria as to deprive him of due process, he introduced in evidence copies of many Chicago newspapers published during the interval between his arrest and his trial. These exhibits do show a considerable amount of publicity regarding crimes in this vicinity and contain articles commenting on the local crime situation, but there was no showing of actual bias on the part of the jury by reason of the publications, or that the newspaper publicity affected at all the ability of the jury to render an impartial verdict. The court is of the opinion that the evidence, submitted on this contention, does not, in this collateral attack upon a State judgment, bring this case within the rule, applied in a very few cases in the United States Supreme Court, where it was determined that the trials were dominated by mob violence or mob psychology (Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Frank v. Mangum, 237 U.S. 309, 345, 35 S.Ct. 582, 59 L.Ed. 969) to the extent that "there was only the form of a court under the domination of a mob" (Ashe v. Valotta, 270 U.S. 424, 46 S.Ct. 333, 334, 70 L.Ed. 662).

Bongiorno appealed from the Criminal Court of Cook County to the Supreme Court of Illinois, and the conviction was affirmed. People v. Bongiorno, 358 Ill. 171, 192 N.E. 856. In the present proceeding, he contends that the affirmance by the Supreme Court of Illinois of his conviction was based upon supposed facts and circumstances not supported by the record on the writ of error.

The story of his crime is related by Bongiorno in his amended application herein as follows: That on July 8, 1933, he and one Ross King agreed to enter a certain building in Chicago and commit the crime of robbery with a gun in order to obtain money for living expenses; that they did commit the crime of robbery with a gun; that, while the robbery was going on, Bongiorno heard a knock at the door and a voice say, "Police officers, open up;" that

he laid down his gun and said, "Don't shoot, I am coming out," and he walked out into the hall with his hands raised and submitted to arrest by police officer Redlich, then standing with a drawn gun; that, while he was in the custody of officer Redlich, King left the premises by a window, came up a stairway behind the police officer and shot the officer, killing him. This recital concludes with the contention that, since the killing of Redlich occurred after the robbery had ended, after petitioner had abandoned the robbery and all other criminal acts, had submitted to arrest and had been in custody for approximately 12 minutes before the officer was shot, petitioner .could not, under the circumstances, have been convicted of the crime of murder and his conviction should not have been affirmed. Apparently, the petitioner made this same contention in the Supreme Court of Illinois. The opinion reads (People v. Bongiorno, 358 Ill. 171, 173, 192 N.E. 856, 857): "It is the contention of the plaintiff in error that he was not a participant in the murder; that he was then under arrest and in the custody of an officer; that about five minutes had expired after the robbery was completed; that the evidence fails to show any previous design or plan to kill; that he neither aided nor abetted in the killing; and that under the circumstances shown by the record he was not guilty of murder." That court, after discussing this contention at considerable length, held that, under the law of Illinois, Bongiorno was properly convicted as an accessory to the murder of Redlich and affirmed the judgment. Among other things, the court said ‘(358 Ill. at page 174, 192 N.E. at page 857) (italics supplied):

"A plan to commit robbery would be futile if it did not comprehend an escape with the proceeds of the crime. These factual circumstances are inseparable. Unless the plan of robbery is to terrify the victim, and, if occasion requires, to kill any person attempting to apprehend them at the time of or immediately upon gaining possession of the property, it would be inane and childlike. Here Bongiorno was attempting to gain his release and make his escape from the scene of the crime not by the use of a deadly weapon, for he had none, but his endeavors were by persuasion and false representations. *He knew that his coconspirator was armed with a gun. He knew that he had gone out of Compton's office. He saw him come up the stairway with gun in hand, behind the officer, and shoot him in the back.* He gave no warning of King's approach, but when the officer reeled and fell he ran and attempted to hide away. He concealed himself until he was arrested by other police officers. It is vain to argue that the killing was not included as a part, if necessary, in the commission of the crime which both Bongiorno and King had deliberately planned."

Petitioner here contends that the italicized portion of the opinion is not supported by the record on the writ of error. He testified in this proceeding and stated his contention in this respect as follows:

"I believe myself not guilty of murder, and I am trying to find out if I am guilty of murder. * * *

"The record is all right, but there was nothing in the abstract of record that said I saw King come up the stairs or that I saw King shoot the cop. It didn't say I saw King go out of the window. It didn't say I knew King was armed, because inasmuch as one revolver was used in the robbery and I had put that revolver down on the desk, how could I have known, after I had gone out into the general hallway, that my co-partner had picked up that gun, had raised the window, jumped out of the window and escaped?"

This court is without power to review the finding of the trial court or the holding of the Supreme Court of Illinois on the issue of whether or not the petitioner was guilty of murder. Clearly, those courts had jurisdiction to pass upon that contention, and, unless a constitutional right invalidating the proceeding has been shown, the finding of the State courts is conclusive and binding upon this court in this proceeding. In Knewel v. Egan, 268 U.S. 442, at page 446, 45 S.Ct. 522, at page 524, 69 L.Ed. 1036, it was said: "It is fundamental that a court upon which is conferred jurisdiction to try an offense has jurisdiction to determine whether or not that offense is charged or proved. Otherwise every judgment of conviction would be subject to collateral attack and review on habeas corpus on the ground that no offense was charged or proved."

In Frank v. Mangum, 237 U.S. 309, at page 329, 35 S.Ct. 582, at page 588, 59 L. Ed. 969, the court said: "It follows as a logical consequence that where, as here, a criminal prosecution has proceeded through

all the courts of the state, including the appellate as well as the trial court, the result of the appellate review cannot be ignored when afterwards the prisoner applies, for his release on the ground of a deprivation of Federal rights sufficient to oust the state of its jurisdiction to proceed to judgment and execution against him."

A writ of habeas corpus can not be employed as a substitute for a writ of error to redetermine petitioner's guilt. United States v. Hiatt, D.C., 33 F.Supp. 1022, and cases there cited. If the point upon which the petition for writ of habeas corpus is based has been raised and decided adversely in the State courts, the decision, except in extraordinary cases, is res adjudicata and may not be reviewed on habeas corpus in the Federal court (United States v. Brady, 4 Cir., 133 F.2d 476, 481, and cases there cited). In Harlan v. McGourin, 218 U.S. 442, 445, 31 S.Ct. 44, 46, 54 L.Ed. 1101, 21 Ann.Cas. 849, the court said: "It is the settled doctrine of this court, often affirmed, that the writ of habeas corpus cannot be used for the purpose of proceedings in error, and that the jurisdiction under that writ is confined to an examination of the record, with a view to determining whether the person restrained of his liberty is detained without authority of law."

The rule is stated in 39 Corpus Juris Secundum, Habeas Corpus, § 13, p. 441, as follows: "The right of a person to the writ of habeas corpus depends on the legality or illegality of his detention, and this in turn depends on whether the fundamental requirements of law have been complied with, *and not at all on the guilt or innocence of the prisoner, or the justice or injustice of his detention on the merits.*"

It appearing from the amended petition and the petitioner's testimony in this proceeding that he was represented by counsel of his own choosing, that he had full opportunity to be heard, and that, in general, he had a hearing conducted according to the settled course of judicial proceedings as established by the law of the State, this court must conclude that the petitioner was accorded "due process" in the constitutional sense. Clearly, both the trial court and the Supreme court had jurisdiction to decide the question of the guilt or innocence of petitioner, and no showing of denial of "due process" having been made, this court is not permitted on this writ to make further examination of the record in the State court.

The petitioner contends that he has been denied the equal protection of the laws in violation of the Fourteenth Amendment.

In the first place, the petitioner says that he was denied opportunity to file a petition for rehearing in the Supreme Court of Illinois, although the rules of that court provided for the filing of petitions for rehearing and such right was accorded to others. While the question is not free from doubt, the court is not satisfied on the record here made that the facts support the petitioner's contention. There is evidence that he had been represented by counsel on his writ of error. He testified that he wrote a letter, requesting a rehearing, to the Supreme Court of Illinois and gave it to the prison authorities for transmission to the court. There is evidence that its transmission to the court was authorized by the prison authorities. There was no evidence that the letter was or was not transmitted. The docket of the Supreme Court is silent in respect thereof. The letter may or may not have been presented to the court and may or may not have been considered by it. While the court is in grave doubt, it does not feel that it can, on these facts, hold that there was a denial of the equal protection of the laws.

In the second place, the relator contends that he was denied equal protection of the laws because on his trial he was denied an opportunity to testify in mitigation of punishment. The Illinois statute provides (Sec. 732, Chap. 38, Ill.Rev.Stats. 1943): "In all cases where the court possesses any discretion as to the extent of the punishment, it shall be the duty of the court to examine witnesses as to the aggravation and mitigation of the offense." And the evidence shows that it is the practice in the criminal courts of Illinois for judges who are about to impose sentences and who have a discretion as to the sentence to be imposed to hold a hearing whereat the defendant may present evidence in mitigation. In the case at bar, the statute required the punishment to be fixed by the jury, who heard the case on a plea of not guilty. The defendant did not take the stand, and he says that he could not have presented his own testimony in mitigation of punishment to the jury without taking the witness stand and subjecting himself to cross-examination not only on this testimony in mitigation but also in respect of his alleged crime, and that, therefore, he

was deprived of the equal protection of the laws. Assuming the petitioner's contention that he would, by taking the stand, have submitted himself for cross-examination generally, because he was a principal, the court, nevertheless, does not believe that the petitioner's contention that he was deprived of the equal protection of the law is well taken. The law of Illinois treats all persons situated as was the petitioner in exactly the same way, and it cannot be said that the classification is not "rested upon some ground of difference having a fair and substantial relation to the object of the legislation" (Stebbins v. Riley, 268 U.S. 137, 142, 45 S.Ct. 424, 426, 69 L.Ed. 884, 44 A.L.R. 1454; Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397; Truax v. Corrigan, 257 U.S. 312, 332, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375), and, accordingly, the court cannot say that petitioner was, in this respect, deprived of equal protection of the law.

Petitioner further claims that his imprisonment is illegal because the sentence of 199 years, fixed by the jury and imposed by the court, was not warranted by any statute, and was therefore beyond the jurisdiction of the court and void.

Under the Illinois parole laws, persons sentenced for life are eligible to apply for parole at the end of twenty years, while persons sentenced for a definite term of years are not eligible to apply for parole until they have served at least one-third of the time fixed in the sentence. Sec. 807, Chap. 38, Ill.Rev.Stats.1943. It is well known that the purpose of imposing 199-year sentences in Cook County, Illinois, is to prevent the prisoner from ever being paroled. Professor Ernest W. Puttkammer, of the University of Chicago Law School, a specialist in criminal law, criminology and penology, testified that such sentences are imposed in an effort to circumvent the parole laws of the State. Petitioner, at the time he was sentenced, was 26 years old, and, accordingly, under a sentence of 199 years, is not eligible to apply for parole until he has served 66⅓ years, or until he reaches the age of more than 92 years.

A prisoner undergoing sentence may be properly discharged on habeas corpus if the sentence is beyond the jurisdiction of the court and void. In re Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118; White v. Levine, 10 Cir., 40 F.2d 502; Manning v. Biddle, 10 Cir., 14 F. 518; Waugh v. Aderhold, D.C., 52 F.2d 702.

The statute of Illinois, fixing the penalties for murder, reads (Sec. 360, Chap. 38, Ill.Rev.Stats.1943): "Whoever is guilty of murder, shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term not less than fourteen years. If the accused is found guilty by a jury, they shall fix the punishment by their verdict; upon a plea of guilty, the punishment shall be fixed by the court."

If the court were at liberty to do so, it would be inclined to rule, in accordance with what it believes to be the implications of the opinion in People v. Heffernan, 312 Ill. 66, 143 N.E. 411, 413, that the sentence in this case was beyond the jurisdiction of the court because there was no statute of the State of Illinois under which the sentence of 199 years might be imposed for the crime of murder. In the Heffernan case, the Supreme Court of Illinois said (italics supplied): "The punishment for murder is imprisonment in the penitentiary for a term of years not less than 14, *and such punishment may extend to life imprisonment,* or the punishment may be death." From this statement, it must be inferred that the Supreme Court of Illinois was then of the opinion that there were three, and only three, sentences possible under the law of Illinois for the crime of murder, namely: (1) death; (2) imprisonment for natural life; and (3) imprisonment for not less than 14 years but not extending beyond natural life.

However, the Supreme Court of Illinois has in three cases,—People v. Pace, 362·Ill. 224, 198 N.E. 319; People v. Rucker, 364 Ill. 371, 4 N.E.2d 492; and People v. Hetherington, 379 Ill. 71, 39 N.E.2d 361,—departed from its holding in the Heffernan case and from what this court believes to have been the true meaning of the statute in question, and held 199-year sentences valid. The court in the Pace case, supra, did not distinguish or expressly overrule the Heffernan case, nor did it point out the portion of the statute which permitted the imposition of the 199-year sentence. It did say, however [362 Ill. 224, 198 N.E. 320]: "The jury evidently intended to permanently remove this defendant from society without exacting his life, and we hold that in so doing they were within the statutory provision that whosoever is guilty of murder 'shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life, or for a term of not less than fourteen years.'"

In the Rucker case, supra, the court did attempt to distinguish the Heffernan case, and said (364 Ill. at page 373, 4 N.E.2d at page 493): "The defendant argues that from this quoted portion of the opinion this court has held that a sentence which lays upon a defendant a penalty in years extending beyond the life of the average man is not warranted and must be held to be a sentence for life. We are not in accord with that construction of the opinion in the Heffernan case and in our judgment such is not a correct interpretation thereof. * * * It is significant that the act fixed a minimum of years that the jury might say a convicted prisoner should serve but left the maximum years in the breast of the jury who heard the case. If the legislative intent was to have fixed a maximum of years which a jury finding a defendant guilty of murder might pronounce it doubtless would have so spoken. We do not agree with the defendant's claim that the words 'a term of years not less than 14' mean any term of years not less than 14 and not exceeding the life expectancy of the average prisoner."

In the Hetherington case, supra, the court did not discuss the statute and contented itself with remarking that the validity of the 199-year sentence had been established.

The construction which the Illinois Supreme Court has placed upon the statute really makes four sentences possible: First, a death sentence; second, a sentence of imprisonment which is more than an imprisonment for natural life; third, imprisonment for natural life; and, fourth, a sentence of imprisonment of not less than 14 years up to natural life. If the Supreme Court of Illinois had not held otherwise, this court would have felt compelled to hold that sentences of the second class above enumerated are not warranted by the statute.

■ Further, it will be observed that in the statute the Legislature speaks of the sentences in the inverse order of their severity, that is,—First, death; second, imprisonment in the penitentiary for natural life; and, third, imprisonment in the penitentiary for not less than 14 years. On the trial of the case at bar, the learned State's Attorney of Cook County testified, and the court thinks correctly, that the 199-year sentence is imposed when the jury wants to give a severe penalty "right next to electrocution." The court believes that only a strained construction of the statute would permit the interposition of a fourth class of sentences for murder, namely, that class which is more severe than life imprisonment and which is (by some) thought to be less severe than death. But the Supreme Court of Illinois has construed the statute, and this court cannot do otherwise than follow the construction. Olcott v. Supervisors, 83 U.S. 678, 16 Wall. 678, 21 L.Ed. 382; Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590; Gresham v. Leslie, 7 Cir., 50 F.2d 900; Cusick v. Whipp, 7 Cir., 73 F.2d 254.

The petitioner contends that imprisonment for 199 years is cruel and unusual punishment for the crime of murder and, under the reasoning of cases like Betts v. Brady, 316 U.S. 455, 461, 462, 62 S.Ct. 1252, 86 L.Ed. 1595, violates the Fourteenth and Eighth Amendments to the Constitution of the United States.

The Supreme Court of the United States has not, apparently, found it necessary to define, with exactitude, what is cruel and unusual punishment within the meaning of the Eighth Amendment to the Constitution. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann.Cas. 705. In the Weems case, the Supreme Court said that, in interpreting the Eighth Amendment, it will be regarded as a precept that punishment for crime should be graduated and proportioned to the offense, and that the amendment is progressive and does not prohibit merely the cruel and unusual punishments known in 1689 and 1787 but may acquire a wider meaning as public opinion becomes enlightened by humane justice. Whether the standard as to what is cruel and unusual punishment may vary with the place of imposition, as well as with the time of imposition, does not seem to have been discussed by the Supreme Court of the United States. Perhaps, since the theory seems to be that the limitations of the Eighth Amendment are extended to State action by the provisions of the Fourteenth Amendment it must needs be held that the standard must be uniform throughout the United States, but that does not necessarily mean that there may not be some elasticity in the standard to accommodate the ideas of the people in different sections of a great and vast country.

It has been said that imprisonment in and of itself is not cruel and unusual punishment, and, having regard to the facts of the cases where that was said, it was probably true, but the court thinks that the

better view is that of Justices Field, Harlan and Brewer in the dissenting opinions in O'Neil v. Vermont, 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450. There are cases to the effect that where the sentence imposed is within the limits prescribed by the statute for the offense committed it ordinarily will not be regarded as cruel and unusual within the meaning of the Eighth and Fourteenth Amendments. Moore v. Aderhold, 10 Cir., 108 F.2d 729; Schultz v. Zerbst, 10 Cir., 73 F.2d 668. And this ought to be the law generally, where the sentence in question was imposed pursuant to a statute of the United States for the simple reason that, generally speaking, the Congress should be held to express the public policy of the nation, but where the sentence in question has been imposed pursuant to a State statute the rule cannot be given as broad an effect if the Eighth Amendment, through the force of the Fourteenth Amendment, is to be regarded as a limitation upon State action. This does not mean, of course, that the actions of State legislatures and of State supreme courts are to be disregarded in determining the public policy of the United States and in determining what is and what is not cruel and unusual punishment. This being so, the court thinks that it may properly look to the action of the Supreme Court of Illinois, as it does. In Ex parte Rosencrantz, 205 Cal. 534, 271 P. 902, 904, the Supreme Court of California said that: "Life imprisonment in the state prison cannot be said to be either cruel or unusual. * * * Neither can it be said that the deprival of petitioner of the right to parole is either cruel or unusual." The court is willing to assume that, under the facts of that case, those conclusions were correct, but the court does not believe that generalizations as to what is or is not cruel, or as to what is or is not, unusual, punishment are helpful. It seems to the court that the question should be whether or not on the facts of the particular case the punishment imposed is, because of its severity, shocking to the sense of justice of the people of the United States, and therefore cruel and unusual.

The court assumes that punishment which does not, because of its severity, shock the sense of justice of the people of the United States cannot be said to be cruel and unusual. The best evidence that 199-year sentences (designed to prevent parole) for the crime of murder do not shock the sense of justice of the people of Illinois is perhaps the fact that the Supreme Court of Illinois has in not less than three cases (People v. Pace, 362 Ill. 224, 198 N.E. 319; People v. Rucker, 364 Ill. 371, 4 N.E.2d 492; People v. Hetherington, 379 Ill. 71, 39 N.E.2d 361) approved such sentences. It is true that in no one of these cases did the Supreme Court of Illinois discuss the question as to whether such a sentence constitutes cruel and unusual punishment, though it did in the Pace case say that the question was presented. Further evidence that long term sentences (designed to prevent parole) for the crime of murder do not shock the sense of justice of the people of Illinois is the fact that, as appears from the evidence, in recent years the Criminal Court of Cook County has in 107 cases imposed long definite term sentences, 50 of them being for the term of 199 years. The court realizes that the action of the Supreme Court of Illinois and of the Criminal Court of Cook County, in approving long definite term sentences for the crime of murder, is hardly satisfactory evidence of the attitude of the entire people of the United States on that subject, but it is, in the court's opinion, some evidence on that subject.

The court gathers, from the testimony of Professor Puttkammer, that the 199-year sentence is, with perhaps minor exceptions, indigenous to the state of Illinois, and, from the evidence generally, perhaps to the County of Cook[1]. One must conclude from

---

[1] Professor Puttkammer testified:

"Q. You are familiar with the principles which are now used in determining the punishments which are imposed for violations of law in various jurisdictions in the United States? A. I believe I am.

"Q. Do you know of any case outside of the State of Illinois in which a punishment of sentence of imprisonment for 199 years for crime has ever been imposed? A. I vaguely recall reading of one in one of the Pacific Coast states. There may

have been others. I would not want to be entirely positive in my statement.

"Q. That may have been 99 years or 199 years? A. I believe it was even longer than that, if my recollection is correct.

"Q. Might it have been 999 years? A. It might have. That is, in fact my recollection.

"Q. 999 years? A. Yes.

"Q. As a criminologist, penologist and lawyer, do you have an opinion in regard to such a sentence? A. Yes, I do.

the evidence that 199-year sentences are unusual in all parts of the United States, other than Illinois, and perhaps Cook County.

"Q. What is that opinion? A. My opinion is that it is an effort to circumvent the parole laws.

"Q. Do you have any opinion about the 199 year sentence as used in the State of Illinois? A. I believe that where such sentences have been imposed in the State of Illinois that would seem to be the most plausible explanation of it.

"Q. Those sentences are imposed in an effort to circumvent the parole laws? A. Yes, sir.

"Q. Will you explain that statement, please? A. Under the Illinois statute a person sentenced to life imprisonment becomes eligible for parole at the expiration of twenty years. Under a definite sentence he becomes eligible for parole at the expiration of one-third of the definite sentence. I do not recall whether time off for good conduct applies to that one-third, but in any event, even if it does on a 199 year sentence, it would be a far longer period than twenty years. It would operate, therefore, to prevent the possibility of consideration for parole for a longer period than would be the case on a straight life sentence.

"Q. You are familiar with the law of Illinois in regard to application for parole, are you not? A. I think so.

"Q. You have been teaching that in your courses in criminal law for some twenty-three years, have you not? A. Yes, sir.

"Q. Is it the law of Illinois that the right to apply for parole after twenty years under a sentence of life imprisonment is an absolute right? A. to apply for parole?

"Q. Yes. A. Yes, sir.

"Q. And the right to apply for parole means, as I understand it, that the applicant thereby becomes eligible to have his case considered by the Parole Board and in the light of all the factors which the Parole Board uses in determining whether or not parole shall be granted? A. I would agree with that statement.

"Q. And that after twenty years, but not before, the Parole Board obtains the power to grant him parole upon his application, if it so sees fit? A. Yes, sir.

"Q. It is your opinion that the public policy of the State of Illinois is that persons sentenced to imprisonment in a penitentiary should not be imprisoned longer than twenty years without being deprived of the right to apply for parole? A. That is my understanding.

"Q. And it is your opinion that the sentence of 199 years was invented and is applied for the purpose of circumventing that public policy? A. It would be impossible for me to say positively what influenced each juror in imposing such a sentence, but it would be difficult for me to see any other reason for it.

"Q. What is your opinion? A. With that qualification, that would be my opinion.

"Q. That the purpose of the 199 year sentence is to circumvent the public policy of the State of Illinois that every person in prison shall, after the expiration of twenty years, have the absolute right to apply to the Parole Board for consideration of his case and for parole? A. I would say yes, because I can see no other reason.

"Q. As a criminologist and penologist, do you have any opinion in regard to the 199 year sentence? A. My opinion is that in all questions having to do with sentences you cannot answer that without knowing what your purpose in sentencing is. If your purpose in sentencing is to secure vengeance, I should say that it was a successful device. If your purpose is deterrence, it might be a successful device. If your purpose is rehabilitation, then it could be regarded as successful only if you assumed that that particular person could not be rehabilitated."

Dr. Max Rheinstein, Professor of Comparative Law at the University of Chicago testified on the trial of this case, at the request of the petitioner, that he had made a study of the laws of thirty-three different nations, other than those of the United States. Among other things, he said:

"I have looked over the laws of England, Canada and Australia. I have looked over the laws of ten Latin American countries. Furthermore, I have looked up the law of the Soviet Union and of fifteen European countries and of three Asiatic countries. All told, thirty-three foreign countries. The choice was simply determined by the availability of materials. In other words, I have looked over the laws of every country for which I can find material in the University of Chicago Libraries. The result was that every one of these countries has the punishment of life imprisonment but also in every one of these countries, in a sentence of life imprisonment, there is the possibility of either executive or administrative clemency. In addition to life imprisonment, every one of these countries has determinate sentences. The maximum length which I could find is in Costa Rica, Paraguay, Uruguay and Brazil. In those countries, the maximum determinate punishment is thirty years. Then in decreasing sequence I have found the following figures: Twenty-five years in Argentina; twenty-four

■ The writer of this memorandum must admit that to him a sentence of a court which determines that a person who is adjudged not to deserve death must serve a term of imprisonment in a penitentiary, from which he cannot reasonably hope to be relieved so long as he lives, is cruel.[2] The writer regretfully states that he believes his view on the subject is that of the minority. It follows that, in spite of the personal opinion of the writer regarding the cruelty of the sentence, the court cannot say that the 199-year sentence, imposed as a punishment for murder in the case at bar, is cruel and unusual punishment under the Fourteenth and Eighth Amendments to the Constitution of the United States[3].

---

years in Italy; under the new Fascist court of Mussolini it is thirty; the same period of twenty-four years in Columbia. Twenty years in the majority of these countries: Austria, Belgium, France, the Netherlands, Norway, Roumania, Yugoslavia, Cuba, Peru, China and Siam; sixteen years in Ecuador and Denmark; fifteen years in Fascist Germany, Hungary, Switzerland and Japan; twelve years in Finland and ten years in the Union of Soviet Socialist Republics. That is the shortest term I could find anywhere.

"Now the situation is peculiar in England and the other common law jurisdictions. In all the countries I have mentioned so far, these years, from thirty down to ten in the Soviet Union, are maximum sentences not only for one crime, but it is the maximum sentence for which a man can be sent to a penal institution for any number of crimes which he may have committed, unless he is sentenced either to death or life imprisonment. In England, Canada and Australia, the maximum sentences are determined for every single crime and the ordinary maximum sentence in England is fourteen years. I could find only one single case where there is a longer sentence permissible, namely, twenty years, and that is in the case of causing an explosion. The situation is similar in Canada and Australia. However, in all these jurisdictions, cumulative sentences may be given and there is no maximum limit to a cumulative sentence. So if a man is convicted for ten crimes, he might be theoretically given a one-hundred forty year sentence. However, to the best of my knowing and opinion, the maximum cumulative sentences which are ever meted out in Great Britain at least, are between twenty-five and thirty years and even in those cases there is always in the background the possibility of clemency or the pardon and parole system. * * *

"Q. In your studies of comparative law, have you ever studied or considered the question of severity of punishment as a deterrent? A. I have had occasion to look into this problem on several occasions, both when discussions were going on in Germany as to a new Criminal Code—the efforts to have a new German Criminal Code go back for about thirty years—and furthermore, I was concerned with a work done for an Italian authority when the Code of Mussolini was under discussion. In all of the discussions, these problems came up, whether the deterrent effect of a criminal sentence would increase with its severity. In all of these discussions, leading criminologists were heard and their opinion was all to the effect that a certain increase of severity might well have a better effect on deterrence, but, however, an optimum would easily be reached and where that optimum would be transgressed, the deterrent effect would not only increase, but rather, decrease because it might result in a general brutalization and also the opinion has been studied as to the deterrent effect it would make on a man as to whether he is sentenced to fifty, thirty or twenty, or some other sentence of years, or whether the prospect of a long sentence would be deterrent enough and so the correlation between severity of sentence and certainty seems to be an answer in favor of punishment.

"Q. Do you have any opinion about the sentence of one hundred ninety-nine years? A. If you want to know my personal opinion.

"Q. Do you have an opinion? A. When I heard it for the first time, I was shocked and outraged because I had never heard of any such thing anywhere before.

"Q. Is that still your opinion? A. That is still my opinion."

[2] It must be understood that the writer is speaking of imprisonment as a punishment for crime, and is not thinking of necessary incarceration of a mentally defective person of criminal tendencies.

[3] If the question were one of the wisdom of the law, which of course it is not, one might very well question the wisdom of a law whereunder a human being who, by the judgment of the courts does not deserve death for his crime, may nevertheless be imprisoned for all of his natural life without hope of release by parole or otherwise. There are of course a number of arguments which may be made against the severity of such a law. First and foremost, perhaps, is the difficulty of its enforcement. Prosecuting officers, judges and juries hesitate to enforce, and seek reasons for not enforcing, very severe laws.

The court comes finally to the last contention of the petitioner, that the totality of facts in the setting of this case constitutes a "denial of fundamental fairness shocking to the universal sense of justice." This court, sitting alone as it does, without benefit of conference with associates, does not feel that it would be warranted on the facts of this case in making a holding such as contended for by petitioner.

It follows, from what has been said, that the prayer of the petition for writ of habeas corpus must be denied, that the petition must be dismissed, and that the petitioner must be remanded to the custody of the Warden of the Illinois State Penitentiary at Joliet, Illinois.

Punishment for crime should be swift and certain, and it can be neither in a community that seeks to impose unduly severe punishments. Another argument against such a law is one that is less frequently mentioned, but is equally cogent, and that is the brutalizing effect which it has upon the persons subjected to it, the arms of the executive charged with the enforcement of it, and the society that countenances it. When a human being is imprisoned without hope of release the discipline to which he must be subjected is almost necessarily rigorous and is generally cruel. This, for the simple reason that it requires a genius in penology and prison administration to find any other way of controlling him, and geniuses are not numerous. This rigorous and cruel discipline is inflicted not only upon the hapless individual who may be serving the unmercifully long sentence but is ofttimes imposed upon his fellows in the same prison serving less lengthy sentences. Such discipline certainly destroys all reformatory effect that imprisonment should have, and tends to brutalize the persons subjected to it, the arms of the executive branch of the government who are required to inflict it, and the whole society that tolerates it.